**In re Miguel V. APONTE, Debtor.**

**Miguel V. APONTE, Plaintiff,**

**v.**

**Walter AUNGST, Jr., Defendant.**

**Bankruptcy No. 85–03157 T.**
**Adv. No. 85–0844.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 16, 1988.

As Amended Feb. 23, 1988.

Kevin Kelleher, Bethlehem, Pa., for defendant.

Frederick L. Reigle, Reading, Pa., trustee.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Plaintiff-debtor ("debtor") Miguel V. Aponte's "Motion for Entry of Judgment" [1] stems from his allegations that defendant, Walter Aungst, Jr. ("defendant") has violated the terms of a Temporary Restraining Order, a Preliminary Injunction and the automatic stay created by 11 U.S.C. § 362. We agree that the egregious conduct of defendant warrants the imposition of actual and punitive damages, and we also award treble damages pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* This opinion constitutes the Findings of Fact and Conclusions of Law required by Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

This turbulent landlord/tenant relationship began in September 1984, when debtor and his wife, Carmen S. Aponte a/k/a Carmen S. Cordero [2] and their two daughters moved into an apartment unit ("unit") owned by the defendant landlord. Although no written lease was signed, debtor agreed to pay rent in the monthly sum of $325.00, which included hot water and heat. N.T. at 10. The electric service remained in defendant's name.

Debtor fell behind in rental payments. As a result, defendant filed an action in state court, in settlement of which the parties agreed that debtor would keep current and pay the rental arrears over time. N.T. at 12, 59. In June of 1985, debtor made a

Lehigh Valley Legal Services, Allentown, Pa., for debtor.

1. Debtor had originally requested entry of judgment and attachment of property in aid of execution. At the hearing on this matter, debtor's counsel agreed not to press for attachment since the scheduled sale of property had not been consummated. Notes of Testimony ("N.T.") at 2.

2. Ms. Aponte had filed a separate bankruptcy prior to August 1, 1985. On December 5, 1985,

counsel filed a motion to consolidate her case with Mr. Aponte's case. That order was never signed because notice of the motion was not provided to all creditors. Subsequently, on October 15, 1987, Ms. Aponte's bankruptcy was dismissed. Thus, although the parties refer to joint debtors in this adversary, N.T. at 9, the cases were never consolidated and we will treat this as Mr. Aponte's complaint.

payment toward this settlement, although the parties dispute the amount paid. N.T. at 12, 59.

It is undisputed that debtors received heat and hot water from September 1984 until early August, 1985. On August 1, 1985, debtor filed his chapter 13 petition.

Defendant admits that he received a copy of that petition, and that debtor's counsel called him after the filing to remind him that he could not terminate debtor's utility service. N.T. at 67. Although defendant did not physically turn off the electric supply, he admits that he called Pennsylvania Power & Light ("PP & L") and told them that he would no longer be responsible for service to that unit. N.T. 67–68. He also instituted a state court action ("August 1st landlord/tenant action") for pre-petition rent and possession of the unit.[3]

On September 17, 1985, debtor filed a complaint to enjoin defendant from violating the automatic stay, alleging that defendant had terminated utility service and had filed the August 1st landlord/tenant action. In spite of receiving four (4) days advance telephonic notice, defendant did not appear at the September 17, 1985 hearing. N.T. at 71. At 10 A.M. on that date, we signed a Temporary Restraining Order enjoining interference with debtor's quiet possession of the unit, "... including, but not limited to, being enjoined from refusing to supply hot water to the debtor." The Order also directed defendant to restore hot water to the unit within six (6) hours. The Order further stated that a $200.00 payment previously made by debtors, N.T. at 60, 72, was adequate security. Defendant received a copy of this Order on September 17, 1985. N.T. at 71.

Defendant violated the September 17, 1985 Order. The hot water was not restored within six (6) hours.[4] N.T. at 21.

The Temporary Restraining Order received by defendant, N.T. at 71, set Sep-

tember 25, 1985 as the hearing date on debtor's request for an injunction. Again, defendant failed to appear. We proceeded to enter an order enjoining defendant from interfering with debtor's right of quiet possession, "... including but not limited to, being enjoined from refusing to supply hot water to the Debtor." Further, we directed defendant to restore hot water within three (3) hours, or face penalties for contempt. We also required that debtors pay an additional $125.00 as security.

Understanding the structure of the building in which the unit is located is important in ascertaining the credibility of defendant's testimony that he did not violate our September 25, 1985 Order. The unit is located in a three floor building. On one side, the first floor apartment is used by defendant for his business. The second and third floors comprise debtor's apartment. On the other side, each floor is a separate apartment. Two of these are vacant, and one is rented by Donna Faye Dobbins ("Ms. Dobbins"), who appeared as a witness in this case.

A major point of dispute is whether the oil-fueled furnace and hot water system in the building is structured so that the heat ducts and hot water pipes for a particular unit can be shunted off so that one unit ceases to receive heat and water while the other units receive an uninterrupted flow. The core of defendant's argument is that service to these units could not be segregated. Thus, because *he* received heat and water in his business (the apartment unit under the debtor), debtor also received heat and hot water. Defendant testified that there was only one occasion on which debtor didn't receive water and the other units did, and that that occurred when a pipe broke. N.T. at 61. Indeed, debtor's counsel was able to elicit only one instance in which debtor had personal knowledge that

---

**3.** Defendant offered inconsistent testimony on the question of whether he had received a copy of the petition prior to the time the August 1st landlord/tenant action was filed. *C.f.* N.T. at 69 ("I went afterward ...") and N.T. at 70 ("... I'm sure I didn't get the petition then ...").

**4.** Defendant claims that the furnace had broken and that water was supplied the next day. N.T. at 21. It is unclear whether this is the same furnace breakdown that caused the lack of hot water earlier in September.

other units had water when his own unit did not. N.T. at 51.

We were forced to consider defendant's credibility because debtor and Dobbins testified that *neither* of their units received heat or hot water for long intervals of time. Dobbins maintained a daily journal from January through March of 1986, chronicling the hot water and heat supply. *See* N.T. at Plaintiff's Ex. 7. She also testified regarding the heat and hot water supply prior to January, 1986. Debtor's testimony is extremely consistent with both Dobbins journal and her testimony. Dobbins testified, consistent with her notes, that one day of the week on which hot water and heat was *never* available was Sunday. N.T. at 46. Interestingly, that is the one day on which defendant did not go in to his business, N.T. at 64, and thus would have no incentive to heat his unit. If we believe his testimony that it was impossible to segregate service to the units, then a lack of heat or hot water to his unit would have resulted in no heat or hot water to the other units.

Defendant urges us to consider his high 1985 fuel bill ($5,700.00) as evidence that he heated all the units on a consistent basis. Standing alone, this "evidence" tells us nothing. We cannot take judicial notice of "average" heating costs. Further, the alleged violations also occurred during 1986, and no testimony regarding his 1986 bills was offered.

We note that debtor's and Dobbin's testimony regarding lack of heat and hot water in February and March of 1986 is consistent with defendant's testimony that a lack of funds caused him to cancel "automatic" delivery of fuel oil—the delivery of a preset amount based on the usage in previous years. Instead, he instructed the oil company to deliver fuel only at his request. He testified that he did this in late January or early February, 1986, and that since that

time he had lacked the funds to keep the tanks filled. N.T. at 63.

In assessing defendant's credibility, we must consider whether the testimony uncovered the motivations of either party. Defendant was clearly motivated by the lack of rental income: "... had they paid the rent to the Defendant ... the Defendant would have had the necessary capital to continue to purchase oil in the manner he had in the past, and the landlord/tenant relationship would have continued without dispute." *See* Defendant's Brief at 4.

 With this background, we find that defendant violated our September 25, 1985 order as follows:

1) Debtor complied with the requirement that security be paid. *Cf.* N.T. at 22 (debtor's testimony that he paid $125.00) and N.T. at 60 (defendant's testimony that he was paid only $100.00).

2) The hot water was not restored within three (3) hours. N.T. at 22. The police were called and arrived at the premises. We find patently incredible defendant's testimony that debtor told police that no water was being supplied when hot water was actually available. N.T. at 76.

3) Debtor received only intermittent heat from October 1985 through Christmas Eve of that year. N.T. at 24 (debtor), 43 (Dobbins).

4) Debtor received only intermittent hot water in the 1985 winter period. N.T. at 24 (debtor), 42–44 (Dobbins).

5) Debtor received no hot water from March 1986 until June 1986. N.T. at 24–25 (debtor), 46 (Dobbins).

6) Debtor received no heat from March 1986 until the end of the wintery months of 1986. N.T. at 25 (debtor), 46 (Dobbins).

We venture into turbulent waters when we determine whether defendant's actions justify the imposition of civil contempt penalties.[5] The drafters of the new bankrupt-

---

**5.** Parties alleging violations of the stay prior to the enactment of § 362(h) relied on the civil contempt remedy. The benchmark for determining whether civil contempt has occurred is determining that the party had knowledge of an

order of court sufficient to put him on notice of proscribed acts. *Wagner v. Ivory (In re Wagner),* 74 B.R. 898, 902 (Bankr.E.D.Pa.1987) (per Fox, J.); *DePoy v. Kipp (In re DePoy),* 29 B.R.

cy rules [6] acknowledged the conflict on the question of whether bankruptcy judges have the power to punish for contempt. *See* Rule 9020, Advisory Committee Notes to the 1987 Amendments. Subsequent to the enactment of the new rules, the first appeals court to have considered the issue has concluded that we lack the power to punish for civil contempt. *Plastiras v. Idell (In re Sequoia Auto Brokers, Ltd.),* 827 F.2d 1281, 1291 (9th Cir.1987).

We find it unnecessary to reach the issue of whether we can punish for contempt. We choose instead to factor into our § 362(h) analysis defendant's continual and blatant violations of our orders. Section 362(h) allows us to impose actual and punitive damages for violations of the stay. This is far broader authority than we can exercise in a civil contempt proceeding (even assuming we have the power to punish for civil contempt), since punitive damages cannot be imposed for civil contempt.[7] *See generally, In re Clark,* 60 B.R. 13, 14 (Bank.N.D.Oh.1986); *In re Behm,* 44 B.R. 811, 813 (Bankr.W.D.Wis.1984); *In re DePoy,* 29 B.R. 471, 479.

The Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. No. 98–353 ("BAFJA") created an important remedy for debtors aggrieved by violations of the automatic stay:

> (h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h). In an excellent discussion of the subject, our colleague, Judge Fox, concluded that the remedy of § 362(h) was meant to supplement, but not sup-

plant, the remedy of civil contempt. *In re Wagner,* 74 B.R. 898. This is consistent with the courts that have held that a finding of civil contempt is not a prerequisite to the imposition of sanctions under § 362(h). *See e.g., Budget Service · Co. v. Better Homes of Virginia,* 804 F.2d 289, 293 (4th Cir.1986).

▮▮▮ On the other hand, all violations of the automatic stay do not trigger the § 362(h) remedy provisions. As the wording of § 362(h) indicates, plaintiff must show a "willful" violation of the stay. We agree with Judge Fox that "... the willfulness requirement refers to the deliberateness of the conduct and the knowledge of the bankruptcy filing, not to a specific intent to violate a court order." *In re Wagner,* 74 B.R. 898, 903. *See also, In re H & H Beverage Distributors, Inc. v. Dept. of Rev. of Pa.,* 79 B.R. 205, 208 (E.D.Pa.1987); *In re Santa Rosa Truck Stop,* 74 B.R. 641, 643 (Bankr.N.D.Fla.1987). Defendant has argued that his conduct was not willful because his actions were caused by his lack of money. N.T. at 5. This does not refute that he had knowledge of the filing, and defendant has cited no authority in support of his argument.

▮▮▮ It is painfully clear that the instant defendant acted willfully. He admits that he received a copy of the petition and a call from debtor's counsel discussing the filing. N.T. at 67. This occurred shortly after the filing. N.T. at 67. Instead of attempting to halt the August 1st landlord/tenant action, defendant allowed it to continue. He has clearly violated § 362(a)(6), which proscribes "... any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." [8] Although not argued, we note

---

471, 475–76, Bankr.L.Dec. para. 69,198 (Bankr. N.D.Ind.1983).

**6.** These new rules took effect on August 1, 1987. This is subsequent to the trial date in the instant matter. We refer to the new rules only to illustrate a conflict, and not to suggest that the parties should have acted in accordance with the highly revised procedures outlined therein.

**7.** The imposition of punitive damages in a civil contempt proceeding can be viewed as a viola-

tion of 28 U.S.C. § 1481, the provision which prohibits a bankruptcy court from punishing criminal contempt not committed in the presence of the court. *See In re DePoy,* 29 B.R. 471, 479 (recognizing the conflict on the issues surrounding the contempt powers of the courts).

**8.** We suspect that the August 1st landlord/tenant action was filed as a result of the settlement of the earlier landlord/tenant action, which, of course, debtor did not completely pay. We might thus view the August 1st landlord/tenant

that defendant cannot hide behind his inactivity. As one court explained, "... creditor inaction can often be as disruptive to the debtor as affirmative collection efforts." *Miller v. Savings Bank of Baltimore (In re Miller)*, 22 B.R. 479, 481, 7 C.B.C.2d 124 (D.Md.1982). Thus, inaction can be a basis for the imposition of damages under § 362(h). *Summerlin v. Outlaw (In re Outlaw)*, 66 B.R. 413, 419 (Bankr.E.D.N.C.1986).

■ We need not rest our decision on defendant's inaction, because he acted affirmatively and attempted to "... obtain possession of the estate" and to "... exercise control over property of the estate ..."[9] in violation of § 362(a)(3). Consider first defendant's clever attempt to suggest that he did not cut off electric service to debtor. He claims merely to have called the electric company and told them that he would no longer pay for the service. We have no doubt that defendant conveniently neglected to inform PP & L that he was a landlord and that the recipient of this service was a debtor.[10] In effect, the defendant acted the role of the errant utility company in effecting the cancellation of electric service. A utility company could not cancel services under 11 U.S.C. § 366[11] without affording debtor certain protections. We will not allow defendant to cause deprivation that the Code specifically prohibits.

Defendant's brazen actions continued. Only sporadic and virtually negligible supplies of heat and hot water were available in the eight months subsequent to the filing of this petition. We have no doubt that defendant was, literally and figuratively, trying to freeze debtor out of the unit.[12] Regardless of whether the problem was caused by broken pipes or failure to purchase oil, his inaction and action was clearly designed to obtain possession of the unit, in violation of § 362(a)(3).

We feel compelled to review the paltry arguments raised by defendant in his defense. Pervading our consideration of these "defenses" is the fact that defendant never raised them at the September 17th and September 25th hearings, and, in fact, did not even bother to attend those hearings. Counsel suggests that defendant failed to appear because he was attending to his small business. If we extended this "excuse" to all of our cases, our courtrooms would be virtually empty.

Defendant explains that it was debtor's failure to pay rent that caused these problems. *See* Defendant's Brief at 4. Starting with the rather obvious proposition that most individuals who seek a "fresh start" through bankruptcy have difficulty paying their bills, we move to the equally obvious statement that the Code does not allow creditors carte blanche when a debtor fails to make payments. The creditor must act in compliance with § 362 of the Code if he wants to proceed against the debtor. We conclude that this "lack of funds" argument is merely a smokescreen. Utilities were not provided even on those occasions on which debtor was able to make pay-

---

action as a continuation of the earlier suit. Section 362(a)(1) prohibits "... the commencement or continuation ..." of a proceeding against the debtor. 11 U.S.C. § 362(a)(1).

9. A tenancy or bare possessory interest in property is a legal or equitable interest constituting property of the estate. *In re DeSantis*, 66 B.R. 998, 1002–03, 15 B.C.D. 229 (E.D.Pa.1986) (per Fox, J.).

10. Debtor notes, persuasively, that had the electric company received this information, it would have sent a notice and continued service for an additional thirty (30) days to allow the transfer of service into debtor's name *See* 66 Pa.C.S.A. §§ 1523(b)(3), 1523(c), 1526, 1527.

11. This section provides that a utility may not discontinue service to a debtor solely on the basis of the commencement of a case, but also provides that the utility may request "adequate protection" from the debtor. 11 U.S.C. § 366(a), (b). If adequate protection is not forthcoming after demand has been made, the utility may then discontinue service. 11 U.S.C. § 366(b).

12. The laws of Pennsylvania do not sanction self-help eviction. *See e.g., Kuriger v. Cramer*, 345 Pa.Super. 595, 607–08 & n. 16, 498 A.2d 1331, 1337 & n. 16 (1985); *Wofford v. Vavreck*, 22 Pa.D & C.3d 444, 450–52 (Crawford Co.C.P. 1981).

ments.[13] Debtor paid $200.00 on September 11, 1985, and $125.00 on October 3, 1985. N.T. at 60. There is no evidence that the supply of hot water and heat was in any way increased after those payments. Underlying all of this is the inherent inconsistency in defendant's arguments that (1) he provided constant heat and hot water and did not violate the automatic stay, and (2) he lacked the money to provide these services because the debtor was not paying rent.[14]

In an amazing display of bravado, defendant also argues that since debtor was able to pay the increased electric and kerosene bills engendered by defendant's failure to supply utilities, debtor should have been able to pay his "antecedent" obligation to defendant. *See* Defendant's Brief at 6. Part of that "antecedent debt" was a pre-petition debt, payment of which would have violated the Code's scheme of treating all prepetition creditors in a specific manner. We need not consider the equities regarding the post-petition debt since defendant's conduct emphasizes his unclean hands.

Fortunately, § 362(h) provides a vehicle through which we can assess damages for this egregious conduct. Indeed, this section has been used to redress similar landlord/tenant situations.[15] *See e.g., Promower v. Scuderi (In re Promower)*, 56 B.R. 619 (Bankr.D.Md.1986), *aff'd.* 74 B.R. 49 (D.Md.1987) (a commercial lease situation in which defendant padlocked and sealed a building); *In re Steinfeld*, 79 B.R. 78 (Bankr.M.D.Fla.1987) (commercial lease); *Davis v. Washington (In re Davis)*, 62 B.R. 345, Bankr.L.Dec. para. 71,221 (Bankr.S.D. Oh.1986) (landlord/tenant situation in which defendant changed the locks, re-

moved debtor's possessions, and hung a "for rent" sign on the unit).

There is ample precedent for allowing attorney's fees and costs for violations of § 362(h). *See e.g., In re H & H Beverage Distributors v. Dept. of Revenue of Pa.*, 79 B.R. 205, 207 (E.D.Pa.1987); *In re Promower, Inc.*, 56 B.R. 619, 622–23; *In re Wagner*, 74 B.R. 898, 905–06; *In re Davis*, 62 B.R. 345, 348. Since we have no evidence of the time spent by debtor's counsel on this matter, we will give debtor's counsel thirty (30) days in which to file a motion listing such fees and costs in accordance with the exacting standards required by this Court.

At trial, debtor produced evidence of his actual damages. He was forced to use kerosene to heat the unit for six (6) or seven (7) months. N.T. at 27. This was an expense he had not previously had to bear, and his uncontradicted testimony indicated that he spent $23.00 each week. Calculating 4.3 weeks per month, over a six (6) month period, at $23.00 per week, we find that the debtor expended $593.40 on kerosene. In addition, he purchased two heaters at a combined cost of $80.00.

To provide hot water, the family was forced to boil water on the stove. This, in addition to use of the heating units, increased his electric bills from $30.00 per month to $200.00 per month. N.T. at 27 (direct), 35, 36 (cross-examination). Thus, for the period November 1985 through April 1986, N.T. at 27, debtor expended an additional $170.00 per month for electric service, or a total of $1,020.00.

We must also consider the effect of this deprivation on debtor and his family. *See e.g., In re Wagner*, 74 B.R. 898, 905

---

**13.** We agree with debtor that a failure to supply heat and hot water breaches the implied warranty of habitability, and is a defense to an action for possession. *See e.g., Kuriger v. Cramer*, 498 A.2d 1331, 1337, 345 Pa.Super. 595 (1985) (defective heating); *Pugh v. Holmes*, 384 A.2d 1234, 253 Pa.Super. 76 (1978), *aff'd.* 405 A.2d 897, 486 Pa. 272 (1979) (affirming the abolition of the doctrine of caveat emptor in residential leases).

**14.** This inconsistency is only partially explained by defendant's testimony that he managed to

pay for oil in 1985 by selling stock from his store and not replenishing it. This still leaves the early 1986 months, during which he cut back on the purchase of oil, N.T. at 63, and during which debtor received virtually no heat or hot water.

**15.** Prior to the enactment of § 362(h), these problems were addressed through the civil contempt remedy. *See e.g., In re Doan's Truck Repair, Inc.*, 34 B.R. 180 (Bankr.D.Wyo.1983); *In re Pierson*, 33 B.R. 743, 744 (Bankr.N.D.N.Y. 1983).

(awarding debtor $100.00 for his "shock alarm and fear"); *Mercer v. DEF, Inc.*, 48 B.R. 562, 565, Bankr.L.Dec. para. 70,545 (Bankr.D.Minn.1985) (awarding debtor $1000.00 for her "... humiliation, embarrassment, anxiety and frustration"). Although debtor has compared the minutae of many cases in its brief, such an exercise is relatively futile because the aggregate of aggravating circumstances in any given case cannot be replicated. We are content to evaluate this record. Although defendant did deprive debtor of heat and hot water during the cold fall, winter and spring months, debtor found alternative sources, for which he will be compensated in the form of actual damages. On the other hand, one kerosene heater and one space heater will do little to offset the winter chill in a two floor apartment. And debtor and his family were subject to the endless monotony of boiling water to meet their hot water needs, and filling and maintaining the heaters. Debtor testified that his daughter was sent home from school "... a couple of times because she got a bad flu because no heat in the house." N.T. at 27. Although this is not sufficient to establish causality, we take note that a lack of heat in our cold northern winters does not contribute to good health. At the very least, we agree with debtor's conclusion that they experienced a "bad" winter. N.T. at 28.

Debtor was also subjected to the additional nuisance of attempting to remedy this situation, which consisted of attending Court on three occasions, conferring with counsel, calling the landlord and calling the police. He prevailed in obtaining both a Temporary Restraining Order and an Injunction, only to discover that defendant considered himself above the law. To compound matters, this travesty impacted the lives of two children. We find that these repeated, knowing violations of the stay and our orders created an endless cycle of deprivation, harassment, discomfort, hopelessness and anxiety, which we will compensate with an award of $2,000.00.

Section 362(h) allows us to award punitive damages "... in appropriate circumstances ...," a term given substance by recent case law. Judge Fox has suggested that if § 362(h) requires a showing of particular willfulness, that heightened state of mind is relevant in assessing punitive damages. *In re Wagner*, 74 B.R. 898,903. This is consistent with the notion that punitive damages should be used only when defendant's conduct "... amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir.1978). In assessing punitive damages, we must consider '... the act itself together with the motive of the wrongdoer and the relation between the parties.' *Allstate Ins. Co. v. A.M. Pugh Assocs., Inc.*, 604 F.Supp. 85, 99 (M.D.Pa. 1984), *quoting Chambers v. Montgomery*, 411 Pa. 339, 344–45, 192 A.2d 355 (1963). Courts have not hesitated to employ punitive damages under the authority of § 362(h). *See e.g., In re Steinfeld*, 79 B.R. 78, 79 (landlord who locked debtor out of her place of business post-petition and failed to return her possessions in spite of court order received an adverse award of damages in the amount of $2,000); *In re Depew*, 51 B.R. 1010, 1014 (Bankr.E.D. Tenn.1985) ($1,000 awarded as punitive damages in a case in which defendant failed to appear at two (2) hearings and never requested $362 relief); *Mercer v. DEF, Inc.*, 48 B.R. 562, 566 ($5,000 awarded as punitive damages when defendant broke down debtor's door when only minor children were home and repossessed a stereo).

It is undisputed that defendant Aungst acted with actual knowledge of the filing of the bankruptcy *and* of our two orders. He continually and repeatedly violated the stay and our orders for a period covering over half a year at grievous emotional and financial costs to the debtor. Punitive damages are clearly appropriate.

An award of punitive damages "... should be gauged by the gravity of the offense and set at a level sufficient to insure that it will punish and deter." *Mercer v. DEF, Inc.*, 48 B.R. 562, 565. We must consider defendant's financial position, because "(t)he award must be suffi-

cient to sting the pocketbook of the wrong-doer." *Id.* at 566. We are faced, as was the *Wagner* court, with a record containing little evidence of defendant's financial condition. *In re Wagner*, 74 B.R. 898, 905. We do know that defendant owns a "large building" in which the subject unit is located. N.T. at 3. He owns and operates a small and deteriorating, N.T. at 4, commercial business, and rental of the four (4) units in this building is apparently "incidental" to his commercial business. N.T. at 3. He alleges to have had difficulty paying for the fuel needed to heat the building in which these units are located. He claims that the rent due on debtor's unit is $3,575.00. N.T. at 66. In the past, the other tenant in the building, Ms. Dobbins, has objected to a rent increase and defendant brought suit against her. N.T. at 50. Two apartment units in the building were vacant at the time of this hearing. N.T. at 37. With this sketchy picture as background, we can only conclude that the defendant is an individual of moderate income with significant associated expenses. We trust that our award of $2,000.00 as punitive damages deters a repeat of this reprehensible performance.[16]

Debtor requests that we treble any damages awarded in accordance with Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UDAP"), codified at 73 P.S. § 201–1 *et seq.* Section 201–9.2 of UDAP provides a private right of action:

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act ... may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less that one hundred ($100) dollars,

and may provide such additional relief as it deems necessary or proper.

73 P.S. § 201–9.2. The omitted text contains a footnote referring the reader to 73 P.S. § 201–3 for a listing of prohibited acts. Notes, 73 P.S. § 201–9.2, p. 34 (1987 Supp.). Section 201–3, in turn, refers to two other sections for lists of prohibited acts, 73 P.S. § 201–2 and 73 P.S. § 201–3.1.

Debtor does not allege that defendant violated the detailed provisions of § 201–2, and relies instead on § 201–3.1, which provides:

> 201–3.1 Regulations
>
> The Attorney General may adopt, after public hearing such rules and regulations as may be necessary for the enforcement and administration of this act ...

73 P.S. § 201–3.1. Pursuant to the rule-making authority of this section, the "Debt Collection Trade Practices" regulations were enacted. 37 PA.CODE § 303.1 *et seq.* This chapter establishes "... what shall be considered unfair methods of competition and unfair deceptive acts or practices with regard to the collection of debts." 37 PA. CODE 303.1. Section 303.3 states that "(u)sing or threatening the use of an unlawful action, the purpose of which is to harm the physical person, reputation or property of a person in order to coerce payment of the debt" is an "... unfair or deceptive ..." act. 37 PA.CODE 303.3(22). It is clear that the UDAP applies to leases of residential property. *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974). Although the language of the UDAP led some courts prior to *Commonwealth* to question whether the UDAP covers leases of residential property, *see e.g., Commonwealth v. Monumental Properties, Inc.*, 10 Pa.Commw. 596, 314 A.2d 333 (1973), we find that the language of the Debt Collection Trade Practices provisions clearly contemplate application to residential lease situations. Section 303.2 defines "debt" as "(a)n actual or alleged past-due obligation ... arising out of a single account as a result of a purchase,

---

**16.** In setting this award we have considered our conclusion in the final portion of this memo, in which we award treble debtor's actual damages.

Our award of punitive damages might have been significantly higher had we lacked the authority to award treble damages.

*lease* or loan of goods, services or *real* or personal *property* for *personal, family or household purposes ...*" 37 PA.CODE 303.2 (emphasis added).

We start with the well established principle that the UDAP must be liberally construed. *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 457–58, 329 A.2d 812, 815–16. Defendant's actions in this case constituted unlawful violations of 11 U.S.C. § 362(a)(6), § 362(a)(3), and of our September 17th and September 25th orders. We find that defendant's purpose in engaging in these actions was to force debtor out of the unit, and that this was an attempt to harm debtor by violating debtor's property interest in the unit. Under these circumstances, it is within our discretion to treble debtor's actual damages. Predictably, there is virtually no case law precedent to aid us in shaping this award. The stark significance of this case is that we have never seen a landlord act with such reckless disregard of the law, the bankruptcy court and the rights of others. None of the arguments raised by defendant excuses or (truly) explains defendant's actions. Despite ample opportunity to brief the issues, defendant could muster no case law authority in support of his arguments. Under the circumstances, we will award treble the actual damages, consisting of $593.40 (kerosene), $80.00 (heaters), $1,020.00 (increased electric costs) and $2,000.00 (deprivation), for a total of $11,080.20.

We summarize our award of damages as follows:

| Pursuant to § 362(h) and the UDAP | Treble actual damages (not including attorney's fees) | $11,080.20 |
|---|---|---|
| Pursuant to § 362(h) and the UDAP | Treble Attorney's Fees/Costs | (to be determined) |
| Pursuant to § 362(h) | Punitive damages | $ 2,000.00 |
| Total Award Excluding Attorney's Fees/Costs | | $13,080.00 |

The order will set forth our award of damages and set a schedule for submission of the records necessary to allow calculation of an award of attorney's fees and costs in favor of plaintiff.