**In re Milton CLARK, Debtor.**

**Beverly WILLIAMS, Kathleen Robbins, Carole Nelson, James Palmer and Marguerita Palmer, Plaintiffs,**

v.

**Milton CLARK and Edward Sparkman, Trustee, Defendants.**

**Bankruptcy No. 87–06081S.**
**Adv. No. 88–0006S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 21, 1988.

As Amended Oct. 25 and Oct. 27, 1988.

Michael Donahue, Linda Ware Johnson, Michael J. Carroll, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Ronald Pressley, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

█ In deciding the outcome of the instant proceeding, we must address this court's powers to determine and penalize the contemptuous behavior of a Chapter 13 Debtor–landlord. We hold here that we do have power to impose civil contempt penalties, including limited monetary sanctions, upon the Debtor in order to compensate the victims of the Debtor's conduct and to implement the Orders of this Court. However, we conclude that all other potential damage claims of the Plaintiff–tenants must be relegated to the bankruptcy claims process and therefore be dismissed in this proceeding.

### B. PROCEDURAL HISTORY

Defendant MILTON CLARK[1] (hereinafter referred to as "the Debtor") filed a voluntary petition for relief pursuant to Chapter 13 of the Bankruptcy Code on December 7, 1987. On January 6, 1988, the Plaintiffs[2] filed the present adversary Complaint, alleging that they were tenants in an apartment building owned by the Debtor and that the Debtor had failed to maintain their apartments in a fit and habitable condition, principally the Debtor's failure to provide such basic utility services as hot water and heat in mid-winter. The relief requested was that this court enter an Order directing the Debtor to restore full utility services to the Plaintiffs' apartments and award them both compensatory and punitive damages. The Plaintiffs also filed, with their Complaint, a Motion for Expedited Hearing and Preliminary Relief, which we granted, scheduling a hearing on January 13, 1988. On that date and upon the agreement of Counsel for the Plaintiffs and the Debtor, an Order was entered (1) requiring the Debtor to provide full utility service including heat, hot and cold water, and electric and gas utility services, to the Plaintiffs' apartments pending a final hearing in this matter; (2) prohibiting the Debtor from turning off the heater at the premises in issue, as had been alleged; (3) granting the Plaintiffs relief from the automatic stay to pursue state court remedies against the Debtor; and (4) requiring the Plaintiffs to pay all future rents into escrow.

Soon after entry of this Order, on January 25, 1988, the Plaintiffs filed a Motion for Attachment of the Debtor for Contempt

---

1. The other named Defendant, EDWARD SPARKMAN, TRUSTEE, is the Standing Chapter 13 Trustee. He has not participated actively in this case to date.

2. The original Complaint was brought on behalf of Beverly Williams, Kathleen Robbins, James Palmer, Carole Nelson, Brenda Shine, and Kim Green. The claims of Brenda Shine and Kim Green were subsequently dismissed due to their failure to escrow rent as required by Orders. *See* page 327 *infra.* James Palmer's wife, Marguerita Palmer, was subsequently joined as a plaintiff on an unopposed motion, since it appeared from the evidence presented in this matter that the lease for the Palmers' apartment was in her name.

of Court, alleging that the utilities had not been restored to the Plaintiffs' apartments, as directed. A hearing was held on this Motion on January 27, 1988. In light of testimony presented at that hearing and pursuant to Bankruptcy Rule (hereinafter "B.Rule") 9020, we entered an Order on January 28, 1988, adjudicating the Debtor in contempt of this court's prior Order and directing the Debtor to fully comply with that Order. We reserved decision regarding the punishment to be imposed or making any other specific directives to attain compliance with our Orders at that time. We hoped that the prospect of the imposition of substantial punishment, including possibly incarceration, would induce the Debtor to voluntarily comply with our Orders. In addition, to insure the Plaintiffs' good faith, we directed the Plaintiffs' counsel to provide the Debtor's counsel with information regarding the depository and account numbers of the accounts into which they would escrow future rents.

The Debtor's slothful performance, despite the entry of this Order, required us to schedule additional hearings in this matter on February 9, 11, and 23, 1988, to monitor compliance with our Orders. It appeared, at each of these hearings, with the possible exception of the February 23, 1988, hearing, that the Debtor had not provided full utility services to the Plaintiffs, requiring further hearings to determine compliance. After the February 23, 1988, hearing, we directed the parties to file Briefs addressing the issue of what further Orders should be entered or punishment should be imposed upon the Debtor, prior to a proposed final hearing on the Plaintiffs' Complaint scheduled on March 10, 1988.

Meanwhile, on February 12, 1988, the Debtor had filed an Answer to Plaintiffs' Complaint and a Counterclaim against each of the Plaintiffs seeking a judgment for rent allegedly due and owing. In response, on March 9, 1988, the Plaintiffs filed a Reply with Affirmative Defenses and "Counterclaims."[3] In their "Counterclaims" the Plaintiffs sought considerably broader and more specific monetary relief than they had requested in their Complaint, including a retroactive rent abatement and reimbursement for out-of-pocket expenses due to the Debtor's alleged breaches of the warranty of implied habitability of the premises; damages due to the Debtor's alleged intentional infliction of emotional distress upon them; punitive damages; and treble damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. (hereinafter referred to by its generic name as a statute regulating unfair and deceptive acts and practices, i.e., "UDAP").

On February 22, 1988, the Debtor filed an apparently retaliatory Motion for Attachment of the *Plaintiffs* for Contempt due to *their* alleged failure to escrow rental payments and to provide information regarding such escrow accounts as required by the court's prior Orders. As a result of a hearing held on this Motion on March 29, 1988, we issued an Order dismissing Brenda Shine and Kim Green as parties due to their complete failures to escrow rents. Our Order directed the remaining Plaintiffs to maintain separate escrow accounts with either the Urban League of Philadelphia or with the Plaintiffs' counsel, and to provide information regarding the balances in same to the Debtor's counsel.

A discovery dispute resulted in adjournment of the final hearing from March 10, 1988, until May 3 and May 10, 1988. After completion of trial on May 10, 1988, we held the record open to afford the Debtor a requested opportunity to submit copies of receipts and bills for repair work, which were filed on May 13, 1988. The Plaintiffs' counsel declined an opportunity to present

---

**3.** The Plaintiffs' pleading was improperly denominated as Counterclaims to the Counterclaims of the Debtor. See B.Rule 7007 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 7. The appropriate means by which a plaintiff may raise further claims against a defendant after an Answer is filed is by amendment of the Complaint, per B.Rule 7015 and F.R.Civ.P. 15. However, since the Debtor raised no objection to the Plaintiffs' pleading, we will address the claims raised in the Plaintiffs' "Counterclaims" as if they had been properly pleaded as claims in an Amended Complaint.

further testimony in light of these additional presentations.

On May 26, 1988, we directed the Plaintiffs and the Debtor to file Proposed Findings of Fact, Conclusions of Law, and Briefs supplementary to their earlier submissions on or before June 17, 1988, and July 18, 1988, respectively, and the Plaintiffs to file a Reply Brief on or before July 25, 1988. The Debtor's delay in submitting his remittance until August 9, 1988, resulted in a delay of the completion of briefing until mid–August, 1988.

Since this is an adversary proceeding involving significant factual issues, we are preparing our Opinion in the form of designated Findings of Fact and Conclusions of Law, pursuant to B.Rule 7052 and F.R. Civ.P. 52(a). Discussions of significant legal issues pertinent thereto are presented directly after each Conclusion of Law.

## C. FINDINGS OF FACT

1. The Debtor is the owner of, *inter alia,* (see Finding of Fact 34, page 332 *infra*), a twenty-four (24) unit apartment building numbered as 126–136 South 54th Street, Philadelphia, Pennsylvania 19139 (hereinafter "the Premises").

2. Each of the Plaintiffs are or were tenants of the Debtor, renting apartments at the Premises. The Plaintiffs' respective monthly rents ranged from $215.00 to $225.00.

3. Pursuant to the rental agreements between the Debtor and each of the Plaintiffs, the Debtor was required to furnish heat, hot and cold water, and electricity.

4. While the testimony of the Plaintiffs varied with respect to specific dates, it is clear that the Premises had been without central heat for a substantial period of time prior to initiation of the present proceeding. Plaintiff Beverly Williams (hereinafter referred to as "Williams"), the mother of four children aged one through seven years, testified that she had not had heat in her apartment except for one day in November, 1987, since April, 1987. Plaintiff Kathleen Robbins (hereinafter referred to as "Robbins"), the mother of three children, aged 4, 2, and 3 months, stated that she had not had heat since April, 1987. Plaintiff Carole Nelson (hereinafter "Nelson"), the mother of girls aged 10 and 14 years, testified that she had not had heat since 1985. Plaintiff James Palmer, father of three children aged 13, 7, and 6 years, testified that he could not recall the last time that he had heat in his apartment.

5. As a result, the Plaintiffs had been heating their apartments with electric space heaters and by warmth generated from their respective gas stoves.

6. Each of the Plaintiffs further testified that he or she had not had any hot water in his or her apartment since spring, 1987.

7. In addition, Williams stated that she has had the following repair problems in her apartment:

a. Window frames rotting, causing glass to fall out of at least one window;

b. Bathroom walls crumbling;

c. Apartment walls blackening. It appears from photographs admitted into evidence that these markings are the result of extreme mold or mildew.

d. Plaster cracking on kitchen walls, resulting in holes above the stove and under the sink in kitchen;

e. Leaking from the ceiling in front bedroom, which ruined her dresser and clothing;

f. Damp smell throughout apartment;

g. Toilet failing to flush;

h. Defective tub drain;

i. Lack of running water in the bathroom;

j. Defective cold water valves;

k. Infestation by mice. Williams testified that mice ate through the box spring and mattress on her bed and that on at least one occasion she found mice in the crib with her infant.

8. Arthur Bagelman of the Childhood Lead Poisoning Prevention Program of the Philadelphia Department of Health testi-

fied that an inspection of Williams' apartment revealed twenty-five (25) areas of chipping and peeling lead-based paint. He further stated that the Department of Health inspected the unit due to the presence of a child, presumably one of Williams' children, with confirmed elevated levels of lead in the bloodstream. Finally, he testified that the Debtor had been advised of this condition and was directed to sand and wash the affected areas by a letter dated March 15, 1988, but that the required repairs had not been made when the unit was reinspected on April 25, 1988.

9. Robbins testified that she has experienced the following additional repair problems:

 a. Hole in kitchen floor;

 b. Leaks in the ceiling of the kitchen and bathroom, causing the kitchen ceiling to fall in;

 c. Lack of gas for cooking from April, 1987, until January, 1988;

 d. Infestation with mice and roaches. Robbins testified that the sound of mice chewing through the walls and ceilings keeps her awake at nights;

 e. Holes in walls; and

 f. Kitchen sink fell from the wall.

10. Nelson indicated that she had the following additional repair problems in her apartment:

 a. Black stains on apartment walls due to mold or mildew;

 b. Hole in hallway wall;

 c. Leak in hallway ceiling;

 d. Defective fire alarm in hallway; and

 e. Warped floors

11. Marguerita and James Palmer (hereinafter "the Palmers"), stated they have experienced the following additional repair problems in their apartment:

 a. Constant leak in toilet;

 b. Hole in the living room floor;

 c. Leak from the tub;

 d. Sloping bathroom floor, which, on April 8, 1988, collapsed under Marguerita Palmer, a disabled individual, trapping her in the floor up to her waist. Ms. Palmer had to be re-moved from this predicament by the rescue squad and required medical treatment;

 e. Holes in walls throughout the apartment;

 f. Leaks from the bathroom toilet and tub;

 g. Leaks from bathroom ceiling; and

 h. An exposed outlet in the bathroom.

12. Alvin T. Rowland, Jr. (hereinafter "Rowland"), Assistant Chief of the Enforcement Unit of the City of Philadelphia, Department of Licenses and Inspections (hereinafter "L & I"), testified regarding L & I's prior inspections of the Premises. He stated that L & I's records contained forty-three (43) Violation Notices which were sent to the Debtor between March, 1985, and April, 1988, each designating separate violations of the Philadelphia Housing Code. All of these voluminous Violation Notices were admitted into evidence. These include five (5) Violation Notices directing the Debtor to repair the hot water heater to provide adequate hot water, the earliest having been issued in September, 1985; and five (5) Violation Notices directing the Debtor to make the heating system operable and to furnish a continuous supply of heat, the earliest such Notice being dated October 16, 1987. The Violation Notices document the additional problems cited by the Plaintiffs, including infestation by rodents and insects; needed repairs in ceilings, walls, and floors; and numerous plumbing and electrical problems. The Debtor was provided with a copy of each Violation Notice issued. All forty-three (43) Violation Notices remain active cases with L & I due to the Debtor's failure to perform the needed repairs.

13. Rowland also stated that, in September, 1986, L & I declared the Premises unfit for human habitation due to the insufficient supply of hot water. The Premises were again declared unfit for human habitation on January 7, 1988, due to the absence of sufficient heat and hot water. The Premises has apparently remained unfit for human habitation throughout the period from September, 1986, to date, as these conditions have not been rectified.

14. The testimony of the Plaintiffs was credible. Their testimony regarding defects in the apartments appeared candid and highly descriptive. The Plaintiffs' testimony was not only consistent with that of each other, but was substantiated by the testimony of Rowland and Bagelman, the L & I Violation Notices admitted into evidence, and numerous photographs submitted into evidence by the Plaintiffs which graphically depict the deplorable conditions of their apartments.

15. Each of the Plaintiffs testified that he or she had complained to the Debtor or his employees of at least some of the above-mentioned repair problems, usually without any result. As a result of these complaints and his receipt of the L & I notices, the Debtor was aware of most, if not all, of the repair problems cited by the Plaintiffs. The Debtor was clearly aware of the non-functioning of the heating and hot water systems of the Premises prior to initiation of the present proceeding.

16. Prior to this court's Order of January 13, 1988, the Plaintiffs had not paid any rent to the Debtor for some time. Robbins and Nelson testified that they had not paid rent since September, 1986; Williams testified that she had not paid rent since June, 1987. The Palmers stated that they had not paid rent since August, 1987. The Plaintiffs were candid in so stating, contending that the condition of the Premises relieved them of their duty to pay.

17. On May 3, 1988, Nelson testified that she had vacated the apartment that she rented from the Debtor in April, 1988. According to the Debtor, all of the Plaintiffs except the Palmers had moved as of the date of the final hearing on May 10, 1988. However, it is clear that at least some tenants remain in the Premises at present.

18. Despite this Court's Order of January 13, 1988, the Debtor failed to provide the Plaintiffs with heat and hot water prior to February 23, 1988.

19. The Debtor was aware, on or before January 18, 1988, that the heating system would not function because of, among other reasons, a problem with the water flow system which would require repairs by a plumber. However, as of the hearing of January 27, 1988, the Debtor had not even contacted a plumber to work on the system.

20. The Debtor presented himself as a vigorous individual, though appearing to be over 70 years of age. Throughout the case, the Debtor's testimony was often disjointed, and occasionally loud and belligerent, despite the absence of provocation.

21. At the hearing held on February 9, 1988, the Debtor testified regarding his effort to repair the heating system. It appears that, while some people had "looked" at the heating system, no repairs had been made to either the heating or hot water system for some considerable time-period before that date. However, the Debtor testified that a Mr. Holloway of the Union Boiler Company was working on the heater while the February 9 hearing was taking place.

22. Jay Raymond (hereinafter "Raymond") is a heating contractor with eight (8) years of experience in installation and repair of heating systems who was called as an expert witness on behalf of the Plaintiffs. Raymond testified at the February 9 hearing that he had inspected the heating system and that, in order to repair the system, it would be necessary to (1) fill the system with water to determine where it is leaking; (2) repair the leaks; (3) replace the burner; (4) test the controls; (5) clean the boiler; (6) re-wire the circulators; and (7) fill and bleed the system. Raymond estimated that the needed repairs would cost $2,000.00. Raymond testified that with respect to the hot water system, the burners should be serviced and the flue pipe replaced for an estimated cost of $300.00.

23. At the February 11 hearing, the heat and hot water were still not operational. Raymond testified that he had visited the properties that morning and that there was no indication of any work having been done to either the heating or the hot water systems. The Debtor again testified that employees from Union Boiler Company

were working on the heating system while the hearing was taking place.

24. At the hearing held on February 23, the Plaintiffs testified that the radiators in their apartments were, for the first time, somewhat warm, but that the heat was inadequate and that some rooms still had no heat. The Plaintiffs further reported that the "hot" water was for the first time not cold, but was no "hotter" than lukewarm.

25. Raymond testified that he had inspected the heating system on the morning of February 23. Raymond observed that four boiler tubes had been replaced but that water was still leaking from the boiler. Raymond testified that, as a result, water was constantly being added to the system, thereby preventing the system from producing sufficient heat. Raymond testified that the hot water tank had been replaced with a tank of the same size, i.e., fifty (50) gallons, which was inadequate for storing the amount of hot water needed for the building.

26. The Debtor testified at the February 23 hearing that he had just turned on the heating system at approximately 4:00 A.M. on that morning. No reason was given for his failure to turn on the heat prior to that time, nor was any explanation provided as to why the supposed repairs occurring at the time of the February 9 and 11 hearings had not been successful.

27. At the hearings held on May 3 and 10, the Plaintiffs testified that they had some heat and lukewarm water for approximately one week after the February 23 hearing, but no heat thereafter, and only lukewarm water, if that, at any time.

28. The Plaintiffs testified as follows regarding expenses incurred due to the lack of heat and hot water and other repair problems in their apartments:

a. Williams:
| | |
|---|---|
| Purchase of electric space heater | $27.09 |
| Cost of kerosene | 5.00 every 3 days |
| Purchase of blankets | 11.98 |

b. Robbins:
| | |
|---|---|
| Purchase of pots (to boil water) | $16.00 |
| Purchase of electric space heaters | 215.00 |

c. Nelson
| | |
|---|---|
| Purchase of pots | 10.00 |
| Purchases of heavy pajamas | 50.00 |
| Purchase of space heaters | 40.00 |

d. Palmers
| | |
|---|---|
| Purchases of blankets | 30.00 |

29. In addition, Williams and the Palmers testified that they were compelled to place their minor children with various relatives during the cold winter months due to the lack of heat and hot water. Williams stated that she had paid $35.00 every two weeks, and the Palmers indicated that they had paid $160.00 every two weeks, to relatives to care for their children.

30. The Debtor testified that he had been operating a successful maintenance business since 1946 and that his financial difficulties were due largely to his use of funds reserved for unemployment compensation insurance to meet his payroll expenses. The Debtor attributed his inability to maintain the Premises to the fact that the IRS was attaching his rental and other income.

31. During the course of his testimony in May, the Debtor complained loudly and bitterly about his tenants.[4] However, he failed to offer any excuse for his failure to furnish heat or hot water other than to complain generally regarding his financial circumstances.

32. The Debtor indicated that he had not purchased fuel for the properties after April 15 because he was under the impression that, despite the Orders of this court, he was under no legal obligation to furnish heat after that date.

33. The Debtor's Answers to Interrogatories show that he is the President of Tri–State Window Cleaning, which had a net income of $25,000.00 for both 1986 and 1987. The Debtor has bank accounts at Mellon Bank, Berean Savings, and Liberty Bank, but failed to produce information regarding the sums in these accounts as

---

**4.** According to the Debtor, his tenants "want to gamble and drink and take dope" and "do not want anybody to do nothing." There was no evidence to support any of these charges, which were clearly irrational attempts by the Debtor to blame his shortcomings as a landlord on others.

requested by the Plaintiffs' Request for Production of Documents.

34. The Debtor owns eight (8) properties in Philadelphia, including the Premises in issue, which he claims have a combined fair market value of $585,000.00. A title search submitted by the Debtor indicates that his properties are encumbered by mortgages and other obligations totaling $328,600.00, leaving a combined equity of $256,400.00.

35. The Debtor submitted bills and checks indicating that he had paid $4,298.16 for repairs to the heating and hot water systems, and $1,891.85 for fuel, at the Premises. However, the Debtor's documentation included three separate payments to three separate companies for installation of a hot water heater. In addition, the checks for fuel include at least one payment for fuel to the Debtor's residence and three payments for fuel after April 15, 1988. As a result of this obvious commingling of receipts for expenses from other properties with the Premises in issue, it is impossible to determine the precise amount paid for fuel and repairs at the Premises by the Debtor.

36. The Debtor's credibility is doubtful on almost every score. While we do not believe that he intentionally uttered falsehoods, his rambling, his irrational bursts of anger, and his recitation of occasional *non sequiturs* convince us that his powers of recollection are diminished, and therefore he is an unreliable historian.

37. While the Debtor, with far less than appropriate haste given their significance to the well-being of the Plaintiffs and their young children, did attempt and actually undertake some repairs of the heating and hot water systems of the Premises, these attempts were obviously inadequate. We attribute this failure to comply with our Orders to lack of organization or ability to accomplish the undertaking of managing the Premises more than to a malicious de-

sire to flaunt this court's Orders or to harm the Plaintiffs. However, the end result is the same as if the Debtor had acted maliciously.

38. While the Plaintiffs did "enjoy" approximately one week of some warmth and a period in which they have been supplied with lukewarm water, it does not appear that any adequately heated water was provided to the Plaintiffs at any time, and it is doubtful whether any or adequate heat will arrive in the fall and winter, 1988–89.

39. The Debtor has therefore failed and continues to fail to comply with this court's Orders of January 13, 1988, and January 28, 1988. Despite our constant attempts to monitor same and induce compliance, the Debtor's efforts at complying with the terms of our Orders have been very slow and ineffective and hence, in our view, totally inadequate.

## D. CONCLUSIONS OF LAW

### 1. *The Bankruptcy Court has Statutory Authority to Determine and Sanction Civil Contempt*

In determining what relief we can provide to the Plaintiffs in the present case we are compelled, at the outset, to consider this court's statutory and constitutional authority to determine and punish contemptuous acts of a debtor in an effort to enforce compliance with this court's Orders. This is an issue which we have not previously addressed.

In 1982, the Supreme Court invalidated the Bankruptcy Code's broad grant of jurisdiction to non–Article III bankruptcy courts. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (hereinafter *"Marathon"*). Since that time,[5] bankruptcy courts' authority to determine and sanction contempt has been the subject of judicial debate. *Compare In*

---

5. The Bankruptcy Reform Act of 1978, at 28 U.S.C. § 1481, had granted bankruptcy courts "the powers of court of equity, law, and admiralty," thus providing a clear statutory basis for the bankruptcy court's contempt power. *In re Johns-Manville Corp.*, 26 B.R. 919, 923 (Bankr.S.

D.N.Y.1983). However, § 1481 was effectively repealed by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter "BAFJA"). 1 COLLIER ON BANKRUPTCY, ¶ 3.01[8][a] at 3–105 (15th ed. 1985). *See In re Haddad*, 68 B.R. 944, 948 (Bankr.D.Mass.1987).

*re Sequoia Auto Brokers Ltd., Inc.,* 827 F.2d 1281 (9th Cir.1987) (bankruptcy courts have neither inherent authority nor express statutory power to punish contempt); *with In re Miller,* 81 B.R. 669 (Bankr.M.D.Fla. 1988) (bankruptcy court has both inherent and statutory power to punish contempt).

Some courts considering the issue have concluded that bankruptcy courts possess an inherent power to enforce their orders by sanctioning civil contempt. *In re Skinner,* 90 B.R. 470, 475 (D.Utah 1988); *Miller, supra,* 81 B.R. at 674; *Haddad, supra,* 68 B.R. at 953; and *In re Reed,* 11 B.R. 258, 261 (Bankr.D.Utah 1981).[6] These courts reason that the contempt power is a necessary adjunct to the jurisdiction of bankruptcy courts to protect the "due and orderly administration of justice and in maintaining the authority and dignity of the court." *Skinner, supra,* 90 B.R. at 475. Other courts considering the issue have concluded that "inherent" contempt power is reserved to Article III courts and that the bankruptcy court's contempt power must be found in a specific statutory grant. *Sequoia, supra,* 827 F.2d at 1284; and *In re Omega Equipment Corp.,* 51 B.R. 569, 572 (D.D.C.1985).

Regardless of whether the bankruptcy court possesses any inherent contempt power, we concur with those cases which have found 11 U.S.C. § 105(a) to provide a sufficient statutory basis for the bankruptcy court's civil contempt power. *See, e.g., Kellogg v. Chester,* 71 B.R. 36-37 (N.D. Tex.1987); *In re Hamilton Allied Corp.,* 87 B.R. 43, 45 (Bankr.S.D.Ohio 1988); *In re Bowen,* 89 B.R. 800, 807 (Bankr.D.Minn. 1988); *In re Stephen W. Grosse, P.C.,* 84 B.R. 377, 385-86 (Bankr.E.D.Pa.1988); *Miller, supra,* 81 B.R. at 676-77; and *Reed, supra,* 11 B.R. at 262. *See also In re Carter,* 691 F.2d 390 (8th Cir.1982) (affirms bankruptcy court's holding attorney in con-

tempt for violation of automatic stay without discussion of jurisdictional issues). *Contra Sequoia, supra,* 827 F.2d at 1290 (broad language of § 105(a) does not confer contempt power since that statutory provision fails to contain any limitations on such authority).

Section 105(a) provides that as follows:
§ 105. Power of court.

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent any abuse of process.

We have previously held that we do not view § 105(a) as a broad imprimatur to "support otherwise insupportable" actions. *In re Latimer,* 82 B.R. 354, 364 (Bankr.E. D.Pa.1988). *See also In re University Medical Center,* 82 B.R. 754, 757-58 (Bankr.E.D.Pa.1988). However, the use of § 105(a) to support a means of enforcement of our orders through the contempt powers appears eminently supportable. The last sentence of this provision was added by the Bankruptcy Code amendments of 1986 for the specific purpose of broadening the general powers of bankruptcy courts to enforce their own procedures and orders. This passage clearly indicates to us that the bankruptcy court is empowered to determine and punish civil contempt.[7] If the bankruptcy court is granted the authority to enforce its orders, then it must be able to address the contemptuous conduct of parties before it. And, if the court may enforce its orders by appropriate action *sua sponte,* then it should clearly can also be able to do so upon the motion of an

---

6. The Advisory Committee Notes accompanying Rule 920 of the Rules of Bankruptcy Procedure, adopted in 1973, stated that bankruptcy courts were invested with inherent power to punish for contempt, citing *Boyd v. Glucklich,* 116 F. 131, 135 (8th Cir.1902).

7. In the legislative history to the 1986 Amendments, Senator Hatch indicated that the bill which preceded the enactment "allows a bankruptcy court to take any action on its own, or to make any necessary determination to prevent an abuse of process and to help expedite a case in a proper and justified manner." 132 CONG. REC. S 15,092 (daily ed. Oct. 3, 1986).

interested party, such as the Plaintiffs here. *See, Haddad, supra,* 68 B.R. at 948.

We therefore conclude that § 105(a), as amended, provides statutory authority for us to punish actions which are contemptuous of our orders.

### 2. *The Bankruptcy Court May Constitutionally Determine and Punish Civil Contempt*

Despite statutory authority, a number of courts have held that civil contempt powers cannot be constitutionally delegated to non-Article III courts such as bankruptcy courts. *See In re Continental Air Lines,* 61 B.R. 758, 775 (S.D.Tex.1986); *In re Industrial Tool Distributors, Inc.,* 55 B.R. 746, 751 (N.D.Ga.1985); and *Omega Equipment, supra,* 51 B.R. at 573. However, we concur with the conclusion of Judge Fox of this court that a civil contempt order entered pursuant to B.Rule 9020 does not offend the separation of powers doctrine embodied in Article III of the Constitution. *Grosse, supra,* 84 B.R. at 386–87.

Congress enacted BAFJA in response to the *Marathon* decision. Section 157 of Title 28 is at the heart of Congress's response to the constitutional deficiencies of the Bankruptcy Code regarding the jurisdiction of bankruptcy courts found in *Marathon.* Section 157(a) grants the District Court original jurisdiction in all bankruptcy cases, but allows such cases to be referred to the bankruptcy court.[8] While the bank-

ruptcy court may "hear and determine," *i.e.,* decide, all core proceedings under Title 11, it may only issue proposed findings of fact and conclusions of law in "related" non-core matters subject to de novo review by the district court. 28 U.S.C. §§ 157(b)(2), (c)(1).[9]

At least two courts considering the issue have suggested that a bankruptcy court's jurisdiction to determine contempt is a core proceeding within the scope of 28 U.S.C. § 157(b)(2). *Kellogg, supra,* 71 B.R. at 37; and *Better Homes of Virginia v. Budget Service Co.,* 52 B.R. 426, 429–31 (E.D.Va. 1985), *aff'd,* 804 F.2d 289 (4th Cir.1986).[10] Other courts have concluded that civil contempt proceedings are core when they involve orders issued in connection with core proceedings. *Industrial Tool, supra,* 55 B.R. 749–50;[11] *Hamilton Allied, supra,* 87 B.R. at 45, 46; *Haddad, supra,* 68 B.R. at 948; and *Johns–Manville, supra,* 26 B.R. at 923–24. *Contra Sequoia, supra,* 827 F.2d at 1289; *Continental Air Lines, supra,* 61 B.R. at 773; and *Omega Equipment, supra,* 51 B.R. at 574.

We believe that the constitutional concerns raised by these latter cases are adequately addressed by recently amended B.Rule 9020. This Rule provides that a contempt not committed in the presence of a bankruptcy judge "may be *determined* by a bankruptcy judge only after a hearing

---

**8.** Each District Court has provided by rule for automatic reference of bankruptcy cases to the bankruptcy court. 1 COLLIER, *supra,* ¶ 3.01[1][a], at 3–3. The particular Order relevant to this court, *In re Bankruptcy Administration,* was entered by former Chief Judge Luongo on July 25, 1984.

**9.** 11 U.S.C. § 105(c) provides that the ability of any officer of a district court, including a bankruptcy judge, to exercise any of the authority or responsibilities conferred upon the court under the Bankruptcy Code shall be determined by reference to the provisions relating to such officer set forth in Title 28.

**10.** In so concluding, the District Court in *Kellogg* reasoned as follows:

assuming that the underlying order properly issued, consideration by a bankruptcy court of a civil contempt motion will encompass

only two issues: whether the alleged contemnor knew of the order and whether he complied with it. Decision of these two issues would involve no determination of private rights under non-bankruptcy law. On the other hand, the issue of whether the alleged contemnor substantially complied with the underlying order may well raise questions as to the nature, contents and meaning of the underlying order, whether the alleged contemnor knew of it, and whether his conduct complied with it, which questions are well within the specialized knowledge and expertise of the bankruptcy court. 71 B.R. at 38.

**11.** The *Industrial Tool* court found 28 U.S.C. § 157(a) to provide a statutory basis for the bankruptcy court's contempt power but concluded that the power of contempt was essentially judicial and could not constitutionally be exercised by a non-Article III court. 55 B.R. at 749–50.

on notice." B.Rule 9020(b) (emphasis added). The Rule further provides as follows:

(c) Service and Effective Date of Order; Review. The clerk shall serve forthwith a copy of the order of contempt on the entity named therein. The order shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court *unless, within the 10 day period, the entity named therein serves and files with the clerk objections prepared in the manner provided in Rule 9033(b).* If timely objections are filed, the order shall be reviewed as provided in Rule 9033 (emphasis added).[12]

While reaching a contrary conclusion, we agree with the reasoning of the district court in *Omega Equipment* that

[i]t seems apparent that it is not so much the nature of a particular power as it is the extent to which it has remained subject to the dominion of an Article III court that has been the constitutional parameter of congressional bestowals of judgelike powers upon non-Article III tribunals.

51 B.R. at 571. We conclude that the *de novo* review established in Rule 9020 provides sufficient involvement by an Article III court to permit the bankruptcy court to initially issue civil contempt orders.[13] *Grosse, supra,* 84 B.R. at 387–88. *See also Skinner, supra,* 90 B.R. at 477–79; and *Miller, supra,* 81 B.R. at 678. *Compare* 28 U.S.C. § 157(c)(1) and B.Rule 9033.[14]

It should be noted that the Bankruptcy Code and Bankruptcy Rules, in several specific instances, provide the basis for punishing certain proscribed conduct independent of the court's civil contempt power. Thus, the bankruptcy court may punish a willful violation of the automatic stay without a

determination of civil contempt pursuant to 11 U.S.C. § 362(h). *Budget Service Company v. Better Homes of Virginia,* 804 F.2d 289, 294 (4th Cir.1986); *In re Boston Business Machines,* 87 B.R. 867, 871–72 (Bankr.E.D.Pa.1988); *In re Aponte,* 82 B.R. 738, 742 (Bankr.E.D.Pa.1988); and *In re Wagner,* 74 B.R. 898, 905 (Bankr.E.D. Pa.1987). Section 303(i) authorizes punishment against unsuccessful involuntary bankruptcy petitioners. In addition, the Bankruptcy Rules authorize the imposition of sanctions for violation of the pre-trial orders, B.Rule 7016; for violation of discovery rules, B.Rule 7037; and for violations of the rule relating to the signing and verification of pleadings, B.Rule 9011. We agree with the *Miller* court that it would be anomalous indeed to conclude that a bankruptcy court may punish a person who improperly signs a pleading under B.Rule 9011, but would be powerless to punish the willful violation of its lawful orders. 81 B.R. at 677. *See also Haddad, supra,* 68 B.R. at 953.

We therefore find no constitutional impairment to our imposition of civil contempt penalties by means of the procedure established in B.Rule 9020.

3. *The Debtor has been and Continues to be in Contempt of this Court's Orders*

The Plaintiffs here seek damages and penalties as a result of the Debtor's alleged failure to comply with the Orders of this court. To find the Debtor in civil contempt, we must find that he violated a specific and definite court order and that he had knowledge of such order. *Kellogg, supra,* 71 B.R. at 38; and *Grosse, supra,* 84 B.R. at 383.

■ The Debtor here clearly had notice of entry of the Order of January 13, 1988;

---

**12.** B.Rule 9033 sets forth procedures for the bankruptcy court's issuance of findings of fact and conclusions of law in non-core proceedings which are subject to *de novo* review by the district court.

**13.** The Advisory Committee Notes to the 1987 Amendments of B.Rule 9020 indicate that "[s]ound judicial administration requires that

the initial determination of whether contempt has been committed should be made by the bankruptcy judge."

**14.** As noted by Collier, B.Rule 9020 "takes no position with respect to whether a contempt matter is core or non-core." 8 COLLIER, *supra,* ¶ 9020.06, at 9020–10.

it was entered by agreement of the parties.[15] Its contents were reiterated in our *Order of Contempt of January 28, 1988,* concerning which no objections, pursuant to B.Rule 9020(c), were filed. The Debtor was, moreover, "reminded" of this Order again and again as we patiently scheduled hearing after hearing to induce him to fully comply therewith. Our Orders of January 13, 1988, and January 28, 1988, specifically directed the Debtor to provide full utility services to the Premises, including heat and hot water, which he failed to do. While the Debtor apparently did make some effort to repair the heating and hot water systems thereafter, his efforts were slow and clearly ineffective. Despite entry of these Orders, and the series of hearings of hearing in February, 1988, there was *no* heat or hot water provided to the Plaintiffs until February 23, 1988. Even on that date, the Plaintiffs had only lukewarm and not *hot* water, and they did not have heat in every room or adequate heat in those rooms with working radiators. Moreover, by May, 1988, although heat was no longer necessary, the warmth of the "hot" water had regressed.

We also note that, although the Debtor was aware, by at least January 18, 1988, that the heating system would require plumbing repairs, he had not even contacted a plumber by the hearing of January 27, 1988. While the Debtor testified at both the February 9 and 11, 1988, hearings that an employee from Union Boiler Company was supposedly repairing the hearing system while the hearings were taking place, no heat was provided until February 23, 1988. At the hearing held on the latter date, the Debtor testified that he had just turned the heat on at 4:00 A.M. that morning, and offered no reason for his failure to turn on the heat prior to that time. More significantly, the Debtor provided no coherent reason for his failure to provide any heat or hot water to the Plaintiffs after approximately March 1, 1988, when the heat ceased.[16] What repair work was accomplished was inadequate and was clearly accomplished only as a result of intensive and time-consuming monitoring by this court.

■ Even at that, we do not find the conduct of the Debtor here quite so "brazen" and thus totally malicious as the landlord castigated by Chief Judge Twardowski in *Aponte,* who obviously attempted to do nothing but add to the misery of his tenants in the face of court orders. However, we find the efforts of the Debtor here almost equally as ineffective as, and their ineffectiveness causing harm to a larger number of innocent tenants and young children than, the malfeasance of the *Aponte* landlord. The Debtor's testimony regarding his income and property indicate to us that making adequate repairs to the Premises is within his financial means. Thus, we easily determine that the Debtor has been and continues to be in contempt of this court's Orders that he provide heat and hot water to the Plaintiffs. The Plaintiffs never have had hot water and now apparently no longer have even lukewarm water. While the lack of an operational heating system was both less critical and more difficult to determine during the past sweltering summer, there is no reason to believe that the heating system will be any more operational in the winter of 1988–89, which surely will shortly arrive, than it was in March, 1988.

---

**15.** The fact that the Order of January 13, 1988, was entered by agreement of the parties does not deprive the court of authority to find the debtor in contempt for failing to comply with same. *Hubbard v. Fleet Mortgage Co.,* 810 F.2d 778, 779–80 (8th Cir.1987) (creditor in contempt of order setting out terms of settlement between parties).

**16.** While the Debtor testified that he had not purchased fuel for the properties since April 15, 1988, this does not explain the failure to provide heat or hot water in March and the beginning of April, 1988. The Debtor's testimony is, in fact, contradicted by checks submitted into evidence by the Debtor for fuel purchases *after* April 15, 1988. In addition, this court's Order of January 13, 1988, required the Debtor to provide heat indefinitely and prohibited him from turning the heat off. The Debtor, by his own admission, officiously stopped providing heat on April 15, 1988 without seeking any modification of this court's Order, because he thought "the law" (uncited) permitted him to do so.

4. *This Bankruptcy Court May Impose Monetary Sanctions for Civil Contempt*

■ Upon a finding of civil contempt, a court may award compensatory damages to the aggrieved party, as well as attorney's fees and costs to the aggrieved party's counsel. *McDonald's Corp. v. Victory Investments,* 727 F.2d 82 (3d Cir.1984); *Skinner, supra,* 90 B.R. at 479; and *Grosse, supra,* 84 B.R. at 385. In addition, the court may impose a fine or *in terrorem* damages to coerce compliance where the contemnor exhibits a proclivity for future misconduct. *United States v. United Mine Workers,* 330 U.S. 258, 304–07, 67 S.Ct. 677, 701–03, 91 L.Ed. 884 (1947); *Reed, supra,* 11 B.R. at 276; and *Grosse,* 84 B.R. at 385.

While at least two courts have suggested in dicta that bankruptcy courts may have authority to impose monetary sanctions for criminal contempt, *Skinner,* 90 B.R. at 478–79; and *Haddad,* 68 B.R. at 954, no bankruptcy court has, to our knowledge, exercised criminal contempt powers. *See Jaquinto v. Greer,* 81 B.R. 870, 881 (N.D. Tex.1988); and *Aponte, supra,* 82 B.R. at 742. It has been held that a criminal contempt order is appropriate only to vindicate the dignity of the bankruptcy court; therefore is not an order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code];" and, as a result, would probably exceed the jurisdictional grant of 11 U.S.C. § 105(a). *Industrial Tool, supra,* 55 B.R. at 750; and *Better Homes, supra,* 52 B.R. at 430.

■ We do not decide the issue of the power of a bankruptcy court to punish criminal contempt because we believe that this Court's civil contempt power authorizes imposition of the monetary penalties which we shall impose hereinafter. Civil contempt involves the refusal to do what has been ordered as opposed to the doing of what has been prohibited. *Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 449–51, 31 S.Ct. 492, 501–02, 55 L.Ed.

797 (1911). It is the character and the purpose of the punishment imposed that distinguishes civil from criminal contempt. *Hicks v. Feiock,* —— U.S. ——, 108 S.Ct. 1423, 1429–31, 99 L.Ed.2d 721 (1988); *Shillitani,* 384 U.S. at 369, 86 S.Ct. at 1534–35; *Gompers,* 221 U.S. at 418, 31 S.Ct. at 492; and *Hubbard, supra,* 810 F.2d at 781. If a penalty is to compensate an injured party or to coerce the contemnor into compliance, then the contempt is civil; if the penalty is imposed to punish in order to vindicate the court's powers, then the contempt is criminal. *Hicks,* 108 S.Ct. at 1430–31; *Shillitani,* 384 U.S. at 370, 86 S.Ct. at 1535; *Gompers,* 221 U.S. at 441, 31 S.Ct. at 498; *McDonald's Corp., supra,* 727 F.2d at 86–87; and *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1343–44 (3d Cir.1976). *See also Skinner,* 90 B.R. at 479.

■ A coercive sanction for civil contempt is generally conditioned upon the contemnor's continuing refusal to comply with the court's orders. *Hicks,* 108 S.Ct. at 1430–31; *Shillitani,* 384 U.S. at 370–71, 86 S.Ct. at 1535–36; and *United Mine Workers, supra,* 330 U.S. at 305, 67 S.Ct. at 702. *See also McDonald's Corp., supra,* 727 F.2d at 87–88 (imposition of retroactive daily fine for past misconduct is criminal contempt). Courts may coerce compliance through a variety of means, including imposition of a fine for past refusal to comply with the court's order conditioned upon continued failure to obey. *Latrobe,* 545 F.2d at 1344–45 (upholding retrospective daily fine conditioned upon continued failure to comply with court's order).

Therefore, monetary penalties for contemptuous acts is, generally, an appropriate punishment for civil contempt.

5. *Limited Monetary Sanctions for Civil Contempt May Be Imposed Against a Debtor*

While courts generally can impose compensatory damages to victims of contempt and monetary penalties to compel compliance with their orders upon parties found

guilty of civil contempt of their orders, additional considerations come into play when such monetary sanctions are imposed by a bankruptcy court against a debtor in bankruptcy. One of the basis tenets of bankruptcy is that all creditors should share equally in realizing their claims from the debtor's estate. *See In re International Endoscope Manufacturers, Inc.*, 79 B.R. 620, 621 (Bankr.E.D.Pa.1987); *In re Lessig Construction, Inc.*, 67 B.R. 436, 441 (Bankr.E.D.Pa.1986). Thus, monetary claims against debtors should normally be relegated to the bankruptcy claims process. *See In re Stelweck*, 86 B.R. 833, 845 (Bankr.E.D.Pa.1988); *In re New York City Shoes, Inc.*, 84 B.R. 947, 960 (Bankr.E.D. Pa.1988); and *International Endoscope*, 79 B.R. at 621–22.

We expanded on the principles which we consider generally applicable to attempts to obtain affirmative relief against debtors in litigation in the bankruptcy court in *New York City Shoes, supra*, 84 B.R. at 959–60. There, we not only relegated the plaintiff to the claims process to recover monetary damages, but we stated, regarding injunctive relief,

> that only "in certain narrow circumstances" where "policy considerations dictate," should a bankruptcy court grant a non-debtor injunctive relief against a debtor as opposed to relief from the automatic stay. *In re Munoz, Grimes v. Munoz*, 83 B.R. 334, 338 (Bankr.E.D.Pa. 1988); and *In re Moore & White*, 83 B.R. 277, 284 (Bankr.E.D.Pa.1988).

Here, the Plaintiffs were granted relief from the automatic stay on January 13, 1988. They could, therefore, have litigated these claims against the Debtor elsewhere. However, even had they done so, and won claims for monetary relief against the Debtor in other courts, the result of that litigation would not have given them authority to collect their judgments against the Debtor without returning to the claims process in this court. The Plaintiffs chose to continue their litigation against the Debtor here, taxing the resources of this court to attempt to frame remedies which the state's police power could possibly have provided more effectively. The Plaintiffs' claims cannot rise to a higher level as a result of their choice to ꞏlitigate here as opposed to elsewhere.[17]

An award of compensatory damages to the Plaintiffs here would, in effect, grant them a priority over other creditors of the Debtor in the distribution process established by 11 U.S.C. § 507. Similarly, the imposition of a coercive monetary penalty payable to this court would, in effect, grant this court a priority over other creditors. Thus, the necessity to enforce the orders of this court must be balanced against the interests of theꞏ Debtor's other creditors.

The majority of cases addressing the issue of the contempt power of the bankruptcy court have had no cause to address these conflicting interests, since, in those cases, contempt remedies were sought by debtors against a non-debtor. *Compare Aponte, supra;* and *Grosse, supra.* Neither do these considerations come into play when the penalty imposed does not directly or adversely affect the economic status of the debtor's estate. *Cf. United States v. Martin–Trigona*, 759 F.2d 1017, 1022–23 (2d Cir.1985) (debtor incarcerated for five days for contumacious conduct designed to disrupt B.Rule 2004 examination); *In re Kennedy*, 80 B.R. 674, 675 (Bankr.D.Del. 1987) (debtor threatened with incarceration for failure to answer questions at a § 341 examination); *In re L.H. & A. Realty*, 62 B.R. 910, 918 (Bankr.D.Vt.1986) (daily fine imposed upon debtor was payable to estate); and *Haddad, supra*, 68 B.R. at 954 (remedy was court's voiding of the debtor's remaining exemption).

■ On the other hand, we conclude that the interests of this court in enforcing its

---

**17.** Of course, many of the Plaintiffs' claims (like Marguerita Palmer's claim for personal injuries derived from her trip through her bathroom floor on April 8, 1988), may arguably have not risen or accrued until after the filing of the bankruptcy, and hence they will be post-petition claims unaffected by the bankruptcy filing. *See* 11 U.S.C. § 502(b); and *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir.1984); *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

own orders must take precedence over the financial concerns of all interested parties, including creditors. It is this court which provides the forum for the process of bankruptcy. Only if this court is able to impose the orderly process set forth in the Bankruptcy Code by directing participants in the process to do what the Code requires can the process remain at all viable. Hence, enforcement of our orders is, in the language of our decision in *New York City Shoes, supra,* a "narrow circumstance" wherein "policy considerations dictate" that we provide a full panoply of relief. We therefore conclude that enforcement of civil contempt powers, even including the imposition of at least certain monetary sanctions, may take priority over any other orders of distribution.

■ We believe that we have broad discretion in formulating an appropriate remedy in addressing civil contempt. *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. at 701; *CBS v. Pennsylvania Record Outlet, Inc.,* 598 F.Supp. 1549–57 (W.D.Pa.1984); and *Johns–Manville, supra,* 26 B.R. at 923. *See also In re Intaco Puerto Rico, Inc.,* 494 F.2d 94, 97 (1st Cir.1975) (flagrant contempt may warrant dismissal of creditor's claim with prejudice); *Haddad, supra,* 68 B.R. at 954 (contempt held to justify voiding debtor's remaining exemption of $5,000.00); and *In re Turbowind,* 42 B.R. 579, 587 (Bankr.S.D.Calif.1984) (contempt held to justify an order directing a turnover of property taken from debtor in violation of automatic stay). However, in exercising this discretion, this court must be sensitive to the interests of creditors not affected by the Debtor's contemptuous acts and must, when imposing monetary sanctions, formulate a remedy narrowly drawn to accomplish the dual objectives of compensating aggrieved parties and coercing compliance with the court's orders.

6. *The Monetary Sanctions Imposed Upon the Debtor Shall be Only Modest Payments to the Plaintiffs and the Deposit of a Sum Which Appears Necessary to Remedy the Debtor's Continuing Violations of our Orders*

■ In the present case, we shall award, directly to the Plaintiffs, certain compensatory damages, plus attorney's fees and costs. *See Quinter v. Volkswagen of America,* 676 F.2d 969, 975 (3d Cir.1982). However, the damages awarded shall be limited to those attributable to the Debtor's failure to provide utilities in violation of this Court's Orders of January 13, 1988, and January 28, 1988.

In our calculations, the cost of the items purchased by the Plaintiffs as a result of the absence of hot water and heat have been used as a basis. The resulting figures have then been halved, since at least part (and we shall set it at half) of these expenditures are attributable to the lack of heat and hot water *prior* to entry of this court's Order of January 13, 1988. By this method of calculation, we award the following compensatory damages to the plaintiffs: Beverly Williams—$279.22;[18] Kathleen Robbins—$115.50;[19] Carole Nelson—$50.00;[20] and Marguerita and James Palmer—$575.00.[21] We will also award reasonable attorney's fees and costs to their counsel. All of these sums will be classified as first-priority claims of administration, pursuant to 11 U.S.C. § 507(a)(1), as we deem

18. Williams:

| | |
|---|---:|
| electric heaters (½ cost) | $ 13.55 |
| cost of kerosene: | |
| $5.00 for every three days × 82 days (from 1/13/88–4/15/88 minus 11 days for heat in February) | 136.67 |
| blankets (½ cost) | 6.00 |
| child care ($17.50 × 7 weeks) | 123.00 |
| | $279.22 |

19. Robbins

| | |
|---|---:|
| Pots (½ cost) | $ 8.00 |
| electric heaters (½ cost) | 107.50 |
| | $115.50 |

20. Nelson

| | |
|---|---:|
| pots (½ cost) | $ 5.00 |
| pajamas (½ cost) | 25.00 |
| heaters (½ cost) | 20.00 |
| | $ 50.00 |

21. Palmers

| | |
|---|---:|
| blankets (½ cost) | $ 15.00 |
| child care ($80.00 × 7 weeks) | 560.00 |
| | $575.00 |

them necessary to preserve the orderly process of this court.

Our greater concern remains with the fact that, despite the indications in February, 1988, that he had done so, the Debtor still has apparently not remedied the defective or non-existent supplies of hot water and heat to the Premises to date. Therefore, in addition to the foregoing damages, we shall require the Debtor to remit a payment of $3,000.00 to Defendant SPARKMAN, the Standing Chapter 13 Trustee (hereinafter "the Trustee"), to be set aside in a special account, retention of which, by the Trustee, shall be conditioned upon whether the Debtor continues to fail to comply with the Orders of this court. This sum shall be returned to the Debtor at a hearing to be scheduled about twenty days hereafter, on October 13, 1988, at the time of a continued hearing on Confirmation of the Debtor's Plan [22] and the Trustee's Motion to Dismiss the case for failure to make Plan payments, *if and only if* the Debtor convinces us that he has repaired the heat and hot water to the Premises sufficiently to sustain an adequate supply of these services through the winter of 1988–89. We shall require that this sum be unconditionally paid by the October 13, 1988, date as well.[23]

However, in the rather likely event that the Debtor is unable to convince us that these services will be supplied, the $3,000.00 [24] fund shall be retained by the Trustee and shall be utilized by the said Trustee to analyze and repair the heating and hot water systems at the Premises.

We would direct the Trustee to make the needed repairs under the authority of 11 U.S.C. § 1304(b), which provides as follows:

**22.** The Plan contemplates payments of $2,805.75 monthly for 48 months. The $3,000.00 payment is therefore only the equivalent of about one extra Plan payment.

**23.** Failure to pay this sum would result in the most severe measures which this court could contemplate, most probably, *inter alia,* placing the Trustee in immediate control of all of the Debtor's assets, pursuant to 11 U.S.C. § 1304(b), to *assure* that it is paid. See page 340 *infra.*

**24.** The amount of the penalty imposed in this Court's estimation of the cost of the needed

(b) *Unless the court orders otherwise,* a debtor engaged in business may operate the business of the debtor, and, subject to any limitations on a trustee under sections 363(c) and 364 of this title *and to such limitations or conditions as the court prescribes,* shall have, exclusive of the trustee, the rights and powers of a trustee under such sections (emphasis added).

This court may, pursuant to this Code provision, place the Chapter 13 Trustee in total charge of the Debtor's business operations in the fashion of a trustee appointed pursuant to 11 U.S.C. § 1108, or may, as we choose here, limit the authority of the Trustee to operate a certain aspect of that business. *See* 11 U.S.C. § 363(c)(1); and 5 COLLIER, *supra,* ¶ 1304.1, at 1304–3 to 1304–4. Since the Trustee will be compensated from the Debtor's estate for his services, it greatly behooves the Debtor to convince us that he can and will repair the Premises himself.

We believe that such action is necessary to implement this court's Orders in light of the Debtor's continuing failure to supply heat and hot water to the Premises. We also believe that this action is an extremely mild penalty, taking into account the Debtor's present financial circumstances, which includes a steady income and income-producing property; and his advanced age and his limited capacities. *Compare United Mine Workers,* 330 U.S. at 305, 67 S.Ct. at 702 ($2,800,000.00 fine imposed, conditioned upon Union's refusal to comply with court's order within a reasonable time); and *Halderman v. Pennhurst State School and Hospital,* 526 F.Supp. 423 (E.D.Pa.1981)

repairs in light of the evidence presented. Plaintiff's expert testified in February that the estimated needed repairs to the heating and hot water systems would cost $2,300.00. The Debtor submitted evidence indicating that he paid for repairs to these systems, which repairs have failed to provide the Plaintiffs with heat and hot water. The Trustee may well decide, if and when he undertakes to make the repairs, that considerably more funding is needed. He may be obliged to request that additional submissions be made for this purpose by the Debtor or that some other disposition of the Premises or the Debtor's other assets be made to fund same.

(funds generated by contempt fine could be used to fund special master and hearing master appointed by court).

We would note that rehabilitation of the Premises, while it may benefit the Plaintiffs, assuming that any of them remain in the Premises, principally benefits the Debtor's estate. As we indicate in the discussion accompanying the immediately succeeding Conclusion of Law, the Debtor's mismanagement of the Premises has eliminated its income-producing potential. The Debtor's estate, as well as the public interest, are thus the real beneficiaries of a process contemplating repair of the heat and hot water systems of the Premises.

### 7. The Debtor is not Entitled to Back Rent From the Plaintiffs

The Debtor filed a Counterclaim against the Plaintiffs seeking judgment for rent allegedly due and owing. Admittedly, the Plaintiffs have not paid rent to the Debtor for a substantial period of time. See Finding of Fact 16, page 330 *supra.* However, the Debtor has failed to provide a habitable premises to the Plaintiffs for an even longer period of time.

Pennsylvania landlords, like those in a majority of jurisdictions, are impliedly obligated to provide and maintain a minimally habitable premises for their tenants. *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979). Thus, the landlord's obligation to provide a habitable premises and the tenant's obligation to pay rent are mutually dependent. *Id.,* 486 Pa. at 292, 405 A.2d at 907. Therefore, if a landlord totally breaches the implied warranty of habitability after receiving notice of the defective conditions of a premises, then the tenant's obligation to pay rent is abated in full. 486 Pa. at 290, 292, 405 A.2d at 906, 907.

The Debtor here has failed to provide the Plaintiffs with housing meeting even the most minimal standards of safety, health, and decency. Our Findings of Fact 12, 13, 15 and 19, at pages 329–30 *supra,* reveal that the Debtor was literally bombarded with notices concerning the Premises' uninhabitability. The Debtor's failure to provide the Plaintiffs with adequate heat or hot water are conditions, which, in themselves, are sufficient to support the conclusion that there has been a complete breach of the implied warranty of habitability as to all of the tenants in the Premises. Furthermore, the Premises manifests infestation with insects and rodents; structural defects, including collapsing floors and ceilings, cracked plaster, and chipped paint; severe plumbing problems; and grossly mildewed walls.

Further support of the complete uninhabitability of the Premises, which would in itself be conclusive, is found in the fact that L & I *declared* the Premises unfit for human habitation in September, 1986, due to insufficient hot water, and again in January, 1988, due to the failure to provide sufficient heat and hot water.[25] It is thus clear to us that the Premises has been totally unfit fur human habitation at all times since September, 1986, and that this condition persists to date. This finding precludes the Debtor's cause of action against the Plaintiffs for rent. We also note that the presence of the forty-three (43) active Violation Notices issued by L & I due to defects in the Premises would preclude the Debtor from evicting non-paying tenants or rerenting the Premises to other prospective tenants, pursuant to local City ordinances. PHILADELPHIA CODE, §§ 9–804(1)(a), 9–804(1)(b).

We find the circumstances in the Premises here considerably worse than those which we found sufficient to constitute a complete breach of the implied warranty of habitability in *In re Fox,* 83 B.R. 290, 293–94, 299–300 (Bankr.E.D.Pa.1988). The premises there lacked heat, at least for one season, but had hot water. No L & I

---

**25.** We note that Pennsylvania statutes provide that, upon certification that an urban dwelling is unfit for human habitation, the landlord's right to collect rent is suspended and the tenant can deposit such rent into an approved escrow account. 35 P.S. § 1700–1. If the dwelling is not certified as fit for human habitation, any monies so deposited are returned to the tenant, except that funds so deposited may be used for repairs or for utility services. 35 P.S. § 1700–1. In any event, no sums are returned to the landlord.

inspectors had been summoned to the property, and therefore no Housing Code violations were documented, let alone, as here, there being a long-outstanding declaration by L & I that the Premises *is* unfit for human habitation. In *Fox*, we concluded that the moving party, qua landlord, was entitled to no rent because she had totally breached the implied warranty of habitability. Here, we reach the same conclusion and hold that, since September, 1986, the Debtor is entitled to no rent whatsoever from the Plaintiffs. All of the Plaintiffs testified that they paid rent until at least that date.

We also reiterate that it is necessary to repair this building to extricate the Debtor and the Debtor's estate from the "slumlord's dilemma" described by us in the *Fox* case. 83 B.R. at 299–300. The Debtor appears to be incapable of accomplishing this, due to his lack of managerial powers, on his own.[26]

8. *The Plaintiffs must Utilize this Claims Process to Assert any Other Affirmative Claims Against the Debtor, and Hence any Further Relief Will be Denied Without Prejudice*

 The Plaintiffs also seek additional affirmative relief against the Debtor for breach of the implied warranty of habitability, including a retroactive rent abatement; damages for deprivation and humiliation; and damages for the Debtor's alleged infliction of emotional distress. *See Fair v. Negley*, 257 Pa.Super. 50, 390 A.2d 240 (1978). We decline to enter judgment for the Plaintiffs on these claims, since we believe that such affirmative claims are unrelated to the Debtor's contempt and hence, for the reasons described at pages 337–39 *supra*, must be raised exclusively by means of the claims process. *See* 11

U.S.C. § 502; B.Rule 3002(c); and *Stelweck, supra*, 86 B.R. at 845.[27]

The Plaintiffs also asked us to impose treble damages under UDAP against the Debtor. While we do not doubt that UDAP is applicable to residential leases, *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974), we are compelled to direct the Plaintiffs to the claims process for such claims, also. This is particularly so of these claims, because compensatory damages awarded for contempt are limited to actual loss. *McDonald's Corp., supra*, 727 F.2d at 87; and *Thompson v. Johnson*, 410 F.Supp. 633, 643 (E.D.Pa.1976), *aff'd*, 556 F.2d 568 (3d Cir.1977). The trebling of the actual damages sustained may be regarded as punitive in nature and may exceed the jurisdictional authority of this court to impose damages for *civil* contempt. See page 337 *supra*. Moreover, we believe that a trebling of the Plaintiffs' actual damage would give them an unwarranted precedence over the Debtor's other creditors. *See* pages 338–39 *supra*.

Of course, the Plaintiffs may, as is also mentioned above, at page 338 n. 17 *supra*, have post-petition claims against the Debtor which will not be affected or discharged by the bankruptcy. However, as to pre-petition claims for damages, we must relegate the Plaintiffs to the claims process.

E. CONCLUSION

An Order consistent with our conclusions expressed herein will be duly entered.

ORDER

AND NOW, this 21st day of September, 1988, after hearings in this matter of January 13, January 27, February 9, February 11, February 23, March 29, May 3, and May 10, 1988, in the above adversary proceed-

---

26. We would observe that rejection of the leases of the Plaintiffs or any of his other tenants by the Debtor would not serve to extricate him, as the lessees could opt to remain in possession of the premises. 11 U.S.C. § 365(h)(1). We also believe that the impact of 28 U.S.C. § 959(a) and public policy would preclude his evicting tenants in violation of the state law and City ordinances referenced at pages 341–42 & n. 25 *su-*

pra. *See In re St. Mary Hospital*, 86 B.R. 393, 397–400 (Bankr.E.D.Pa.1988).

27. We note that, among the Plaintiffs, only Nelson filed a timely Proof of Claim, in the amount of $5,000.00. We also note that the bar date for further filings has passed.

ing, and upon review of the parties' Proposed Findings of Fact, Conclusions of Law, and various Briefs submitted by counsel for the parties in this matter, it is hereby ORDERED AND DECREED as follows:

1. Except as provided in the Order of Contempt included in paragraph three hereof, the Plaintiffs' Claims and Counterclaims to the Counterclaims of the Defendant and Debtor, MILTON CLARK, are DISMISSED without prejudice.

2. The Debtor's Counterclaims against the Plaintiffs are DENIED and DISMISSED with prejudice.

3. Pursuant to Bankruptcy Rules 9020(b) and (c), having stated the essential facts in the foregoing Opinion, the following Order in civil contempt shall become effective within ten (10) days, in accordance with Bankruptcy Rule 9020(c), unless an interested party hereto serves and files, with the Clerk of this Court, objections prepared in the manner provided in Bankruptcy Rule 9033(b):

a. The Debtor is adjudicated to have acted in contempt of this court's Orders of January 13, 1988, and January 23, 1988.

b. The Debtor is directed once again to fully comply with this court's Orders of January 13, 1988, and January 28, 1988, forthwith, and thereby assure the supply of all utility services, including adequate heat and hot water, to the Premises at 126–136 South 54th Street, Philadelphia, Pennsylvania 19139, throughout the winter of 1988–89.

c. The Plaintiffs are awarded compensatory damages as a result of the Debtor's contempt of our Orders to date, and Judgment is hereby entered against the Debtor and in favor of the Plaintiffs in the following amounts, which shall be considered as priority claims, pursuant to 11 U.S.C. § 507(a)(1):

| | |
|---|---|
| Beverly Williams | $279.22 |
| Kathleen Robbins | 115.50 |
| Carole Nelson | 50.00 |
| Marguerita and James Palmer | 575.00 |

d. In addition, the Plaintiffs are awarded reasonable attorney's fees and costs for prosecution of their motion for attachment for contempt of court, exclusive of time spent on the fee application, since these funds will come from the Debtor's estate, *see In re Shaffer–Gordon Associates, Inc.,* 68 B.R. 344, 348–50 (Bankr.E.D.Pa.1986), which shall be considered as priority claims, pursuant to 11 U.S.C. § 507(a)(1). The parties are urged to attempt to agree upon reasonable attorney's fees and costs which are due to the Plaintiffs' counsel. If this matter is not resolved within fifteen (15) days of this Order, the Plaintiffs may file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).

e. The Debtor is directed to pay the sum of $3,000.00 to the Chapter 13 Trustee on or before October 12, 1988, which shall be returned to him only if he establishes, to our complete satisfaction, at the hearing described in the next paragraph, that all utilities, including heat and hot water, will be supplied to the Premises throughout the winter of 1988–89.

4. The Debtor, the Chapter 13 Trustee, and any Plaintiffs remaining in the Premises and their respective counsel are directed (and any other witnesses are invited) to appear at a further hearing at the following date, time, and place to ascertain whether the Debtor has complied with paragraph 3(e) of this Order; whether full utility service including hot water and heat, will be available to all tenants of the Premises without the intervention of the Standing Chapter 13 Trustee, pursuant to 11 U.S.C. § 1304(b), throughout the winter of 1988–89; and what intervention of the Chapter 13 Trustee is necessary or appropriate:

THURSDAY, OCTOBER 13, 1988, at 10:00 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

