**In re Milton CLARK, Sr., Debtor.**

**Bankruptcy No. 87–06081S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 27, 1989.

Ronald J. Pressley, Philadelphia, Pa., for debtor.

Eugene J. Chikowski, Wayne, Pa., for Corestates Bank.

Michael Donahue, Community Legal Services, Inc., Philadelphia, Pa., for Williams, Robbins, Palmers, Nelson.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The matters before us are an epilogue to our Opinion of September 21, 1988, reported at 91 B.R. 324, granting certain former tenants of the Debtor-landlord, MILTON CLARK, SR., a portion of the relief which they sought against him in a prior adversary proceeding. At issue are proofs of claims filed by four of the tenant-plaintiffs (hereinafter referred to collectively as "the Claimants") in that proceeding, to which the Debtor has objected. The Claimants allege that the Debtor continuously breached the implied warranty of habitability regarding their premises and that they are entitled to recover retroactive rent abatements, compensatory damages for personal property lost or purchased as a result of the condition of the rented premises, and compensation for "deprivation and humiliation." The Claimants also seek to treble their damages by invocation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (as this is a law prohibiting unfair and deceptive acts and practices, it is hereinafter referred to by its generic designation as "UDAP.")

We hold here that those Claimants who paid rent during that period are entitled to a retroactive rent abatement from September, 1986, until the filing of the Debtor's bankruptcy petition. We also award that portion of damages sought for property lost or purchased as a result of the Debtor's breach of the implied warranty of habitability which we did not already award in our previous Opinion as compensation for the Debtor's contempt of our Orders in the adversary proceeding. However, we decline to allow claims for rent abatements prior to September, 1986, because there is

insufficient proof that the implied warranty of habitability had been breached prior to that date. Neither do we award damages for any injuries incurred subsequent to the filing of the Debtor's bankruptcy petition, as these are post-petition claims. Given the nature of the habitability problems presented here, we believe that the claimants are entitled to some compensation for "deprivation and humiliation," or discomfort. In addition, in light of the substantial and continuous nature of the habitability defects, we find that the claimants are entitled to treble damages under UDAP, but only as to certain of their claims. Specifically, we limit recovery of treble damages to the Claimants' out-of-pocket expenses occasioned by the prolonged lack of heat and hot water in their units.

## B. PROCEDURAL HISTORY

The Debtor filed the underlying voluntary petition for relief pursuant to Chapter 13 of the Bankruptcy Code on December 7, 1987. The Claimants, Beverly Williams, Kathleen Robbins, James and Marguerita Palmer,[1] and Carole Nelson, are prior tenants of the Debtor's 24–unit apartment building located at 126–36 South 54th Street, Philadelphia, Pennsylvania 19139.[2] On January 6, 1988, the Claimants, and two other tenants who were subsequently dismissed as parties therefrom, filed an adversary Complaint against the Debtor alleging that he had failed to maintain their apartments in a fit and habitable condition. The Claimants sought, in the adversary action, a variety of remedies, including an order requiring the Debtor to provide full utility services to their apartments and awards of both compensatory and punitive damages.

On January 13, 1988, upon the agreement of counsel for both the Claimants and the Debtor, an Order was entered requiring the Debtor to provide full utility services, including heat and hot water, to the Claimants' premises and granting the Claimants relief from the automatic stay to pursue any state court remedies. The Debtor failed to comply with the terms of this Order, and an Order of Contempt was entered against the Debtor on January 28, 1988. *See* our previous Opinion, 91 B.R. at 327. As a result of the Debtor's subsequent slow compliance with our Orders of January 13, 1988, and January 28, 1988, we were required to hold several hearings to monitor the Debtor's compliance with our Orders. *Id.* at 327–28.[3]

In view of our finding that the Debtor remained in continuous contempt of this Court's Orders through the date of the final hearing, *id.* at 335–37, we awarded damages to the Claimants, but limited those damages to those attributable to the Debtor's failure to provide utilities contrary to this Court's Order of January 13, 1988, and January 28, 1988, plus attorneys' fees and costs. *Id.* at 339–41, 343. We specifically declined to enter judgment in that proceeding with respect to any other claims against the Debtor for damages, holding that such claims must be raised by means of the claims process in this bankruptcy case. *Id.* at 342.

Prior to our Opinion in the adversary matter, only Carole Nelson, among the present Claimants, had filed a proof of claim in the Debtor's bankruptcy case. *See id.* at 342 n. 27. The bar date of August 29, 1988, had passed by the time that we filed our Opinion. Nevertheless, on October 13, 1988, undoubtedly enlightened by our Opinion, the Claimants filed their present proofs of claim.[4] The Claimants

---

**1.** The Palmers, a married couple, are referred to throughout as one "Claimant."

**2.** Counsel for both the Debtor and the Claimants have advised that none of the Claimants reside in this building any longer.

**3.** These hearings were conducted on January 27, February 8, February 11, and February 23, 1988. In addition, the same issues were addressed in the final hearing held on May 3 and 10, 1988.

**4.** The Claimants also filed proofs of claim for the damages awarded in the above-mentioned adversary proceeding. In our Opinion, we accorded such claims, and their counsel's claims for attorneys' fees and claims, administrative-claim status, pursuant to 11 U.S.C. § 507(a)(1). *Id.* at 339–40. These claims were allowed in the following amounts: Williams—$279.22; Robbins—$115.50; Nelson—$50.00; and Palmers—$575.00. *Id.* at 339 & nn. 18–21, 343. The claim for attorneys' fees and costs was ultimately al-

also filed, on that date, a motion to file their proofs of claims after the bar date and Objections to confirmation of the Debtor's Chapter 13 Plan. On November 4, 1988, the Debtor filed his Objections to the claimants' proofs of claims alleging, among other things, that the claims were not timely filed.

The proofs of claims themselves are bare-bones, and merely recite a total sum claimed by each of the four Claimants. It is only upon receipt of the Claimants' Brief that we were provided with any sort of breakdown whatsoever. We can now ascertain that the claims asserted by each of the Claimants are as follows: (1) Beverly Williams (hereinafter "Williams"): $1,800.00 for rent rebate (October, 1986, to May, 1987); $983.07 for replacement of damaged property and purchases to provide heat;[5] and $1,400.00 for "deprivation and humiliation," measured in her case (and for all other Claimants) at $100.00 monthly (here, for the period from October, 1986, to December, 1987); treble the total of $4,183.07, or $12,549.21; less the $279.00 previously awarded; resulting in a net figure of $12,270.21; (2) Kathleen Robbins (hereinafter "Robbins"): $1,250.00 for rent rebate (March, 1986, to September, 1986); $396.00 to purchase pots, an electric heater, and hot plates; $2,100.00 for "deprivation and humiliation;" treble the total of $3,846.00, or $11,538.00; less the $115.50 previously awarded; resulting in a net figure of $11,422.50; (3) James and Marguerita Palmer (hereinafter "the Palmers"): $6,880.00 for rent rebate (January, 1985, to August, 1987); $410.00 for blankets and child care; $3,600.00 for "deprivation and humiliation;" treble the total of $10,890.00, or $32,670.00; less the $575.00 previously awarded; resulting in a net figure of $32,-095.00; and (4) Carole Nelson (hereinafter "Nelson"): rent rebate of $3,600.00 (January, 1985, to April, 1986); $80.00 for purchases of blankets, pots, and pajamas; $3,300.00 for "deprivation and humiliation;" treble the total of $6,980.00, or $20,940.00; less the $50.00 previously awarded; resulting in a net figure of $20,890.00. Thus, the demands of the Claimants total the eye-popping sum of $76,677.71.

A hearing was conducted in the Debtor's main bankruptcy case on December 8, 1988, to consider confirmation of the Debtor's Plan, Objections to confirmation filed by the Claimants and by another creditor, Corestates Bank; the Debtor's Objections to the claims in issue and to the claim of Corestates Bank; and the Claimants' motion to file late proofs of claims. After consideration of the arguments of counsel on the matter, we concluded that the prior adversary Complaint constituted the filing of timely "informal" proofs of claims on behalf of the Claimants, and we granted their motion to file late claims in an Order dated December 9, 1988. *See In re Ungar,* 70 B.R. 519, 521–23 (Bankr.E.D.Pa.1987). It was agreed by counsel that the Debtor's Objections to the present proofs of claim should be submitted on the record made in the adversary proceeding. The Claimants were directed to file their Brief in this matter on December 22, 1988, with the Debtor's Brief due on January 6, 1989. The hearing to consider confirmation and the Debtor's Objection to Corestates Bank's proof of claim was continued until March 9, 1989. The Claimants' Brief was timely filed on December 22, 1988, and the Debtor's Brief was untimely filed on January 9, 1989.

Since the present matter involves "allowance or disallowance of claims against" the Debtor's estate, it is a core matter which can be determined by this court pursuant to 28 U.S.C. § 157(b)(2)(B). As it is not an adversary proceeding, this matter is not

---

lowed in the total sum of $13,694.75, a reduction of $1,632.00 from that which was sought, in an Order of December 8, 1988.

**5.** These items include the following:
$90.00 for the replacement of her bed and box springs;
$27.09 for the purchase of an electric heater;
$100.00 for the purchase of kerosene;
$11.98 for purchase of blankets;
$140.00 for the purchase of extra food;
$200.00 to replace clothing ruined by a roof leak;
$399.00 for replacement of a dresser ruined by a roof leak; and
$15.00 for the replacement of a rug.

within the scope of Bankruptcy Rule 7052, *see In re Campfire Shop, Inc.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987), and we may therefore issue the present Opinion in narrative form.

As this matter is to be decided based upon the record developed in the adversary proceeding and the present claims are the self-same matters addressed therein, we adopt both the factual findings and legal conclusions contained in our previous Opinion. We will not repeat our factual findings set forth in that matter, 91 B.R. at 328–32, and will supplement those findings only as is necessary to decide the present controversy.

## C. DISCUSSION

### 1. GENERAL GUIDELINES: ONLY THE CLAIMANTS' PRE-PETITION CLAIMS AS TO ELEMENTS OF DAMAGES PROVEN IN THE RECORD WILL BE ALLOWED

As noted above, one element of damages which the Claimants each seek, at this juncture, is a retroactive abatement of rents, certain portions of which some of them had previously paid, as a result of the Debtor's breach of the implied warranty of habitability. *See* 91 B.R. at 341–42 (Claimants are not liable to the Debtor for back rent due to complete breach of warranty of habitability by the Debtor). The Claimants further seek reimbursement for money spent on supplemental sources of energy (*i.e.*, kerosene, electric heaters, etc.), which were necessitated by the Debtor's failure to provide heat and hot water. The proofs of claims here in issue also include demands, by each of the Claimants, for "deprivation and humiliation" and for treble damages under UDAP.

The present matter fits within the fifth possible proof of claim scenario discussed *In re Lewis*, 80 B.R. 39, 41 (Bankr.E.D.Pa. 1987). As a result, since the Debtor arguably has produced evidence in support of his Objections by defending the adversary proceeding, the Claimants bear the burden of proving their claims by a preponderance of the evidence.

It is clear that, in Pennsylvania, a breach of the implied warranty of habitability will support a tenant's affirmative claim for damages against a landlord. *Fair v. Negley*, 257 Pa.Super. 50, 54, 390 A.2d 240, 242 (1978). A lease is to be construed as a contract, and standard contract remedies are available to both landlord and tenant for a breach thereof. *Pugh v. Holmes*, 486 Pa. 272, 284, 405 A.2d 897, 903 (1979). The standard measure of such damages is the "percentage reduction in use" method, *i.e.*, the diminution in value of the leased premises by reason of the defects giving rise to the breach of the implied warranty of habitability. 486 Pa. at 275–76, 405 A.2d at 909–10. The tenant may also recover incidental or consequential damages resulting from the breach. *See Fair, supra*, 257 Pa.Super. at 54, 390 A.2d at 242; and *Beasley v. Freedman*, 256 Pa.Super. 208, 210–11, 389 A.2d 1087, 1088 (1978).

Three matters are addressed by us preliminarily before turning to the individual proofs of claim. The first involves fixing the time during which the Debtor breached the warranty of habitability, thereby excusing the Claimants' payment of rent for that period. *Pugh, supra*, 486 Pa. at 292, 405 A.2d at 907. This time period is significant, as it sets the parameters of the Claimants' claims for retroactive rent abatement.

We already found in the adversary proceeding that the Debtor had failed to provide the Claimants with housing that met even the most minimum standards of safety, health, and decency. 91 B.R. at 341–42. Throughout that proceeding, the Claimants testified extensively regarding the substandard conditions of the premises, including the lack of heat and hot water, infestation by rodents and insects, crumbling walls, leaking ceilings, and collapsing floors, and we credited same. *Id.* at 328–29. The substantial disrepair of the premises was also documented by forty-three (43) Violation Notices issued by the City of Philadelphia's Department of Licenses and Inspections (hereinafter "L & I") between March, 1985, and April, 1988. *Id.* at 329. L & I declared the premises unfit for hu-

man habitation in September, 1986, due to the insufficient supply of hot water, and again in January, 1988, due to the Debtor's failure to supply adequate heat and hot water. *Id.*

As a result of the deteriorating condition of the leased premises, the Claimants discontinued rent payments on various dates. In light of the Debtor's complete breach of the implied warranty of habitability, however, we found, in the course of the adversarial proceeding, that the Debtor was not entitled to recover on his Counterclaims against the Claimants for any back rent. *Id.* at 341–42. The Debtor's total breach of the implied warranty of habitability will likewise entitle those Claimants who continued to make their rental payments to a refund of rental payments remitted.

In the adversary proceeding, we found that the Debtor's breach of the implied warranty of habitability stretched from September, 1986, through the date that we rendered a decision in that matter, *i.e.*, September, 1988. *Id.* at 341. This finding is amply supported by both the testimony of the Claimants and the documentary evidence from L & I. However, three of the Claimants here seek retroactive rent abatements *prior* to September, 1986. Robbins seeks an abatement of rent paid from March, 1986, through September, 1986. The Palmers seek a rebate for rent paid from January, 1985, through August, 1987. And Nelson seeks a rebate of rents paid from January, 1985, through April, 1986.

We are unable to conclude, on the basis of the present record, that the condition of the premises at any time prior to September, 1986, constituted a breach of the implied warranty of habitability. The testimonial evidence of conditions prior to that date is scant. Robbins testified that her heat "wasn't very good" when she moved in March, 1986. Nelson indicated that there was a "problem" with heat in winter, 1985–86. However, the extent and duration of the "problem" at that time was not fully developed on the record. In order to excuse a tenant from a rental-payment obligation, the condition complained of must be a serious one. *See Pugh, supra,* 486 Pa. at 291–92, 405 A.2d at 907. The Claimants bore the burden of proving the breach of the warranty of habitability with respect to their pre-September, 1986, claims. *Lewis, supra,* 80 B.R. at 41. We are unable to conclude on the basis of the present record that it was established that the Debtor's implied warranty of habitability to the Claimants was breached prior to September, 1986. Accordingly, we shall not grant the Claimants recovery for retroactive rent abatements prior to that date.

■ Secondly, as we noted in our Opinion in the adversary proceeding, post-petition claims are neither affected nor discharged by the filing of the Debtor's bankruptcy petition. *Id.* at 338 n. 17. *See* 11 U.S.C. § 502(b); and *In re M. Frenville Co.,* 744 F.2d 332, 337 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). The Claimants have not argued that any of their post-petition claims, other than those already accorded that status by our prior Opinion and Order, are properly classifiable as administrative claims. As a result, we will not allow any claims for damages which arose post-petition. Specifically, we will not grant any claims for rent abatements, child care expenses, or any other matters which arose after December 7, 1987. The Claimants are of course free to pursue those claims at a different time and place.

The December 7, 1987, cut-off date requires that we also deny some of Williams' claims for property damage. We will not allow Williams' claim for a replacement bed purchased due to damage by mice, since the bed was purchased in March, 1988. In addition, we shall disallow Williams' claims relating to replacement of a dresser, clothing, and a rug. According to Williams' testimony, these belongings were damaged as a result of a roof leak which occurred in or after January, 1988.

■ Finally, the Claimants here seek incidental and consequential damages for the costs of replacement heaters, child care, and other expenses necessitated by the lack of heat and hot water in the premises. In a claim for breach of the implied warranty of habitability, a tenant may be compensat-

ed for such incidental and consequential damages. *Fair, supra,* 257 Pa.Super. at 53–54, 390 A.2d at 242, 243 (tenant may recover for reasonable repair and replacement of property damaged by the breach and excess utility bills created thereby); and *Beasley, supra,* 256 Pa.Super. at 211, 389 A.2d at 1088 (tenant can recover additional damages causally related to breach of the warranty of habitability).

In the adversary proceeding, we awarded the Claimants some damages for their expenses necessitated by the lack of heat and hot water. The compensatory damages awarded there were due to the Debtor's failure to provide utilities in contempt of this court's Orders of January 13, 1988, and January 28, 1988. 91 B.R. at 339. We awarded damages for half of these expenditures since they were, in part, attributable to the lack of heat and hot water prior to entry of this Court's Order of January 13, 1988. *Id.* at 339, nn. 18–21. We will adjust the Tenants' Claimants' claims here to allow single, but avoid double, compensation for these expenditures.

2. ACTUAL DAMAGES ALLOWED TO THE CLAIMANTS: COMPUTATION OF PRE–PETITION ELEMENTS OF DAMAGE NOT PREVIOUSLY AWARDED

■ Having addressed these preliminary matters, we shall proceed to address the Claimants' specific respective demands for compensatory damages and retroactive rent abatements. Williams moved into her apartment, in October, 1986, agreeing to pay a monthly rent of $225.00. As a result of the defective condition of her unit, she last paid rent in April, 1987. Due to the lack of heat in her apartment, Williams incurred expenses for an electric heater and blankets. She also claims to have paid $50.00 for kerosene for the months of October and November, 1987. In addition, Williams paid $70.00 per month to her mother to care for her children during the winter months. In light of the above, we

calculate Williams' actual damages as follows:

| | |
|---|---:|
| electric heater (balance of $27.09) | $ 18.54 |
| blankets (balance of $11.98) | 5.98 |
| kerosene | 100.00 |
| child care | 140.00 |
| rent rebate from October, 1986, through April, 1987 | 1,575.00 |

Robbins moved into her unit in March, 1986. Her monthly rent was also to be $225.00, which was last paid in September, 1986. In addition, she seeks compensation for heaters, hot plates, and pots. We calculate Robbins' compensable expenses as follows:

| | |
|---|---:|
| pots (balance of $16.00) | $ 8.00 |
| electric heater (balance of $215.00) | 107.50 |
| hot plates | 170.00 |
| rent abatement for September, 1987 | 225.00 |

The Palmers had resided in their apartment since September, 1984. Their monthly rent was $215.00, which they continued to pay until August, 1987. The Palmers also paid to place their children with relatives during the winter months due to the lack of heat in their apartment. We therefore calculate the Palmers' compensatory damages as follows:

| | |
|---|---:|
| blankets (balance of $30.00) | $ 15.00 |
| child care | 380.00 |
| rent rebate from September, 1986 through August, 1987 | 2,500.00 |

Nelson moved into her apartment in September, 1979. Her monthly rent was $225.00, which was last paid in May, 1986. Nelson also seeks reimbursement for heaters, pajamas, and pots which she purchased due to the lack of adequate heat and hot water to her apartment. We calculate Nelson's damages as follows:

| | |
|---|---:|
| heaters (balance of $40.00) | $20.00 |
| pots (balance of $10.00) | 5.00 |
| pajamas (balance of $50.00) | 25.00 |

3. DAMAGES FOR "DEPRIVATION AND HUMILIATION": $500.00 ALLOWED TO EACH CLAIMANT

■ In addition to the compensatory damages discussed above, the Claimants each seek an award for "deprivation and humiliation." This claim appears to be a component of the Claimants' requests for compensatory damages due to the Debtor's breach of the implied warranty of habitability.[6]

---

6. The Claimants do not present a claim for the intentional infliction of emotional distress, which is also a potentially cognizable claim by a tenant against a landlord. *See Fair, supra,* 257

In *Beasley,* the Pennsylvania Superior Court held that, where there is a breach of the implied warranty of habitability, a tenant may recover, in addition to recovery of excess rentals paid, consequential damages which are proximately caused by the breach of the warranty. 256 Pa.Super. at 211, 389 A.2d at 1088. *See also Roeder v. Nolan,* 321 N.W.2d 1, 5 (Iowa 1982) (tenant may recover incidental and consequential damages); *Mease v. Fox,* 200 N.W.2d 791, 797 (Iowa 1982) (tenant may recover incidental and consequential damages which falls within the general principles governing the allowance of such damages); *Detling v. Edelbrock,* 671 S.W.2d 265 (Mo. 1984) (en banc) (tenant entitled to damages for impaired enjoyment of premises and consequential damages); and *Glyco v. Schultz,* 35 Ohio Misc. 25, 289 N.E.2d 919 (Sylvania Co. Mun.Ct.1972) (damages included cost of necessary repairs and damages to personal property). *See generally* Annot., *Measure of Damages for Landlord's Breach of Implied Warranty of Habitability,* 1 A.L.R. 4th 1182 (1980). *See also Javins v. First National Realty Corp.,* 428 F.2d 1071, 1072–73 (D.C.Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

While we are not aware of any reported Pennsylvania cases on this issue, we are persuaded by the reasoning presented by the highest courts in two other states that damages for breach of the implied warranty of habitability may include claims for "deprivation and humiliation." The first of these cases involved a proceeding presented by certified question to the West Virginia Supreme Court, *Teller v. McCoy,* 162 W.Va. 367, 253 S.E.2d 114 (1978). In that case, the West Virginia Supreme Court joined Pennsylvania and many other jurisdictions in rejecting the doctrine of *caveat emptor* in the context of landlord-tenant relations, and held that a warranty of habitability is implied in every residential lease. 253 S.E.2d at 122–23. In discuss-

ing the appropriate measure of damages for such a breach, the court reviewed authorities which measured damages by the difference between the fair market value of the premises if they had been as warranted and as they actually were, and cases which ascertained damages as a percentage reduction of use. *Id.* at 127. However, the court concluded that neither approach should be the exclusive means of measuring damages for breach of the warranty of habitability in a non-commercial case. *Id.* at 128. The court reasoned that

> money damages so assessed, while appropriate in the commercial cases, are inadequate in most residential landlord-tenant tenant cases, since the residential tenant who endures a breach of the warranty of habitability normally does not actually lose only money. The typical residential tenant rents a dwelling for shelter, not profit. When the warranty is breached, he loses, instead, such intangibles as the ability to take a bath or use hot water as frequently as he would like, he may be forced to worry about the health of his children endangered by rats, roaches, or other undesirable pests, or he may be denied the use of certain rooms in the apartment because there is odor, severe water leakage, or no heat. "When [the measure of damages] is difficult to apply because the property in question is not used commercially, it may be necessary to formulate a measure of damages that is more uniquely adapted to the plaintiff's injury." *Jarrett v. E.L. Harper & Son, Inc.,* W.Va. [160 W.Va. 399] 235 S.E.2d 362, 365 (1978).

*Id.* Thus, the *Teller* court concluded that, when the warranty of habitability is breached, a tenant may recover not only for the diminished value of his or her unit, but may also recover damages for annoyance and inconvenience proven to have resulted from the breach.

Pa.Super. at 60–61, 390 A.2d at 245–46; and *Beasley, supra,* 256 Pa.Super. at 211–12, 389 A.2d at 1088–89. Indeed, it is unlikely that the record in the present case would support such a claim, since there was no evidence that the Debtor intentionally engaged in behavior

which was "extreme" or "outrageous" as to any of the Claimants. *See In re Frymire,* 87 B.R. 856, 860–62 (Bankr.E.D.Pa.1988); and Annot., *Tenant's Recovery of Damages for Emotional Distress Under Uniform Residential Landlord and Tenant Act,* 6 A.L.R. 4th 528 (1981).

In *Hilder v. St. Peter*, 144 Vt. 150, 478 A.2d 202 (1984), the Vermont Supreme Court considered a landlord's appeal from an award of damages to a tenant for breach of both the implied warranty of habitability and express contractual provisions. During her tenancy, the *Hilder* plaintiff experienced a myriad of problems with her rental unit. When she initially moved in, she found garbage and personal items left by the prior tenants still there. The kitchen window was broken, and the plaintiff was never provided her with a key for her apartment. The toilet remained clogged and inoperable throughout the tenancy. In addition, water leaked from an upstairs apartment which caused a section of plaster to fall on to her bed and her grandson's crib. A broken sewage pipe resulted in an odor of raw sewage that permeated the plaintiff's apartment during the summer months. 478 A.2d at 206. The *Hilder* court concluded that these facts "evince[d] a pattern of conduct on the part of the defendants for which the term 'slumlord' surely was coined." *Id.* at 211.

Thus, the Vermont Supreme Court upheld the trial court's conclusion that the plaintiff was entitled to reimbursement of all rent paid plus additional compensatory damages. *Hilder*, 478 A.2d at 202.[7] In discussing the measure of damages, the *Hilder* court stated, 478 A.2d at 209, that

[w]e also find persuasive the reasoning of some commentators that damages should be allowed for a tenant's discomfort and annoyance arising from the landlord's breach of the implied warranty of habitability. *See* Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New Issues*, 62 Calif.L. Rev. 1444, 1470–73 (1974) (hereinafter cited as *A New Doctrine* ); [Note, *The Implied Warranty of Habitability: A Dream Deferred*, 48 UMKC L.Rev. 237, 250–51 (1980) ]. Damages for annoyance and discomfort are reasonable in light of the fact that

"the residential tenant who has suffered a breach of the warranty . . . can-

not bathe as frequently as he would like or at all if there is inadequate hot water; he must worry about rodents harassing his children or spreading disease if the premises are infested; or he must avoid certain rooms or worry about catching a cold if there is inadequate weather protection or heat. Thus, discomfort and annoyance are the common injuries caused by each breach and hence the true nature of the general damages the tenant is claiming."

Moskovitz, *A New Doctrine, supra,* at 1470–71. Damages for discomfort and annoyance may be difficult to compute; however, "[t]he trier [of fact] is not to be deterred from his duty by the fact that the damages are not susceptible of reduction to an exact money standard." *Vermont Electric Supply Co. v. Andrus,* 132 Vt. 195, 200, 315 A.2d 456, 459 (1979).

██ The Claimants here were subject to extensive discomfort and annoyance as a result of the condition of their respective rental units. Williams had crumbling walls in her bathroom and holes in her kitchen walls. Her toilet failed to work for months and, when it did, it ran over into the bathtub. Williams testified that her apartment was infested with mice. She testified graphically about finding the mice in her child's crib. She slept at night with the lights on to keep the mice away, but, even so, she stated that she could feel them eating away at her bed's boxspring at night. In the morning, she was greeted by the sight of mice coming into the apartment through a hole in the wall from the bathroom. Furthermore, one of her children was injured by eating debris from the apartment's walls that turned out to be infested with lead paint.

The other Claimants' testimony duplicated that of Williams. Robbins testified that the sound of mice chewing through the wall kept her awake at night. Robbins'

---

**7.** The *Hilder* court also found that an award of punitive damages may be appropriate when a landlord, after notice, fails to repair a facility essential to the health and safety of the tenant. 478 A.2d at 210.

kitchen ceiling had fallen in as a result of leaks, her sink was broken, and the kitchen floor had sunk, preventing her from using most of her kitchen. The Palmers and Nelson presented similar testimony regarding their leaky ceilings, crumbling walls, and warped and sloping floors.

Most notable and egregious among the problems that the claimants experienced are the fact that they lived without *any* heat or hot water since early spring, 1987. As a result, they attempted to obtain some heat by use of electric and kerosene heaters and the warmth generated from their gas stoves. Reliance on these alternate sources to heat an apartment, of course, presents additional dangers of fire and other detriments to the health and safety of tenants. As a result of the lack of heat and hot water, the Palmers and Williams were compelled to place their minor children with relatives during the cold winter months.

In *In re Aponte,* 82 B.R. 738 (Bankr.E.D. Pa.1988), Chief Judge Twardowski of this court awarded both actual and punitive damages to a tenant against a landlord who failed to provide essential services in violation of the automatic stay, pursuant to 11 U.S.C. § 362(h). The debtor/tenant in *Aponte* was deprived of heat and hot water for approximately six months. 82 B.R. at 744. In discussing the appropriate measure of damages in that case, Judge Twardowski reasoned as follows:

> We must also consider the effect of this deprivation on debtor and his family. *See, e.g., In re Wagner,* 74 B.R. 898, 905 [ (Bankr.E.D.Pa.1987) ] (awarding debtor $100.00 for his "shock alarm and fear"); *Mercer v. DEF, Inc.,* 48 B.R. 562, 565, Bankr.L.Dec. para. 70, 545 (Bankr.D. Minn.1985) (awarding debtor $1,000.00 for her "...humiliation, embarrassment, anxiety and frustration") ... Although defendant did deprive debtor of heat and hot water during the cold fall, winter and spring months, debtor found alternative sources, for which he will be compensated in the form of actual damages. On the other hand, one kerosene heater and one space heater will do little to offset the winter chill in a two floor apartment.

And debtor and his family were subject to the endless monotony of boiling water to meet their hot water needs, and filing and maintaining the heaters.

.    .    .    .    .

> To compound matters, this travesty impacted the lives of two children. We find that these repeated, knowing violations of the stay and our orders created an endless cycle of deprivation, harassment, discomfort, hopelessness and anxiety, which we will compensate with an award of $2,000.00.

*Id.* at 745.

The Claimants here were subject to the "inconvenience" of lack of heat and hot water. They were faced with the "discomfort" of living with mice and lead paint. In addition, the Palmers and Williams were separated from their children due to the lack of heat and hot water. We feel that these are compensable injuries.

However, the Claimants did not present extensive evidence regarding these damages. As a result, we shall limit their award for these injuries to $500.00 each. *Compare Simon v. Solomon,* 385 Mass. 91, 431 N.E.2d 556 (1982) (court upholds jury award of $35,000.00 against landlord for reckless infliction of emotional harm and breach of covenant of quiet enjoyment when water and sewage from an adjoining area flooded their apartment approximately thirty times); and *Dorgan v. Loukas,* 19 Mass.App. 959, 473 N.E.2d 1151, 1153 (court awards $2,000.00 for emotional distress as a result of landlord's failure to maintain apartment).

D. THE CLAIMANTS' DEMANDS FOR TREBLE DAMAGES UNDER UDAP: WE WILL TREBLE ONLY THE SPECIFIC DAMAGES CLAIMED AND NOT THE RENT ABATEMENTS OR AMOUNTS FOR "DEPRIVATION AND HUMILIATION"

The only issue remaining is the Claimants' attempt to treble their damages by invoking 73 P.S. § 201–9.2(a) of UDAP. This law provides, in pertinent part, that a court "may, in its discretion, award up to

three times the actual damages sustained" to a person establishing a violation of UDAP.

It is well-established that Pennsylvania's UDAP is applicable to landlord-tenant relationships. *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 457–78, 329 A.2d 812, 815–26 (1974); and *Aponte, supra,* 82 B.R. at 746–47. The Claimants here rely heavily on *Aponte,* wherein this court awarded a tenant damages of $13,-080.00 against his landlord, as a basis for our trebling of all of the elements of damage allowed to them. However, despite certain similarities of *Aponte* to this case, *i.e.,* both address claims by tenant(s) against a landlord, there are certain important distinctions. First, the landlord here is the Debtor; in *Aponte,* the Debtor was a tenant wronged by his family's landlord. Secondly, perhaps more importantly, the court there found specific provisions of the Pennsylvania Debt Collection Trade Practices Regulations, 37 PA.CODE § 303.1, *et seq.,* which has been promulgated pursuant to UDAP, 73 P.S. § 201–3.1, to have been violated by the landlord. Here, the Claimants have failed to identify any particular violation of UDAP or Regulations promulgated thereto by the landlord. Rather, the Claimants seem to be arguing that the Debtor's wrongful conduct was *per se* an unfair trade practice. Finally, Chief Judge Twardowski expresses outrage at the tactics of the *Aponte* landlord, which he characterizes as a willful and brazen attempt to intentionally disregard both his Orders and the rights of the debtor. 82 B.R. at 742–44. Here, as we pointed out in our previous Opinion, 91 B.R. at 332, 336, the conduct of the Debtor was, in our view, attributable solely to his incompetent nonfeasance, and he did ultimately make some efforts to comply with our Orders.

■ It is nevertheless clear that the Debtor here allowed the unfit conditions of the Claimants' apartments to continue unabated for a substantial period of time. While we previously concluded, *id.,* that

the Debtor did not intend to create the sub-standard conditions in these apartments, he clearly had little or no regard for his duty to insure habitable conditions. These conditions continued for a period in excess of a year and a half despite complaints from tenants, notices from L & I, and numerous proceedings in this court. The issue presented is whether allowing and failing to timely remedy such continuous and substantial violations of the implied warranty of habitability can, in itself, constitute an "unfair or deceptive act or practice" proscribed by UDAP.

The Pennsylvania UDAP statute declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201–3. It bears repeating that the statute, being remedial in nature, "must be liberally construed to effect its objective of the protection of consumers in a broad range of activities." *In re Russell,* 72 B.R. 855, 872 (Bankr.E.D.Pa.1987). Thus, UDAP has provided a remedy for a wide variety of wrongs to consumers. This principle was recently strongly expressed by the Third Circuit Court of Appeals in *In re Smith,* 866 F.2d 576, 581–82 (3d Cir.1989). In *Smith,* the Court held that a mortgagee's "failure to properly serve the mortgage complaint, particularly in the absence of providing the thirty-day pre-foreclosure notice as required by Act 6 [41 P.S. § 403] ..., and its conduct prior to the commencement of the foreclosure proceedings, constituted a violation of the UDAP." *Id.,* at 585. In *Russell, supra,* we concluded that any substantial violation of any Pennsylvania Consumer protection legislation would constitute a violation of UDAP. 72 B.R. at 871. We have also applied UDAP to lender overreaching in a business transaction, *In re Jungkurth,* 74 B.R. 323, 334–35 (Bankr. E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa. 1988), and to the systematic imposition of excessive late charges, contrary to the terms of a mortgage contract. *In re Andrews,* 78 B.R. 78, 82 (Bankr.E.D.Pa.1987).[8] Indeed, in *Monumental Properties, supra,*

---

8. In *Smith, supra,* the Court of Appeals approved of our decisions in *Russell, Jungkurth,*  and *Andrews.* 866 F.2d at 581.

the Pennsylvania Supreme Court concluded that 73 P.S. § 201–2(4)(xvii), the residual provision of the UDAP list of "unfair methods of competition," which includes "any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding," "was designed to cover generally all unfair and deceptive acts or practices in the conduct of trade or commerce." 459 Pa. at 478, 329 A.2d at 826. *See also Commonwealth ex rel. Zimmerman v. Nickel*, 26 Pa.D. & C. 3d 115 (Mercer Co. C.P.1983) (state Attorney General can assert that a violation of the federal Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.*, also violates UDAP). *Cf. In re Fleet, Fleet v. United States Consumer Council, Inc.,* Bankr. No. 81–04969S, Adv. No. 83–0880S, slip op. at 34–38 (Bankr.E.D.Pa. Dec. 8, 1988), *recommendations adopted,* 95 B.R. 319 (E.D.Pa. 1989) (FULLAM, CH. J.) (New Jersey UDAP proscribes price unconscionability).

Courts in other jurisdictions have found that, in certain circumstances, a landlord's failure to maintain rental properties in a habitable condition violates state UDAP provisions. In *Wolfberg v. Hunter,* 385 Mass. 390, 432 N.E.2d 467 (1982), the Massachusetts Supreme Court upheld an award of damages for violation of a state statute prohibiting the "use or employment by another person of unfair or deceptive acts or practices declared unlawful" in connection with the lease of real or personal property. 432 N.E.2d at 472. The court there found that the tenant-plaintiffs were entitled to damages where they had been subjected to "a substantial interference with the use and enjoyment of the apartment" due to rodent infestation. *Id. Accord, Dorgan, supra* (court upholds award of treble damages under state consumer protection law due to landlord's failure to maintain the dwelling unit in proper condition).

In *Borders v. Newton,* 68 N.C.App. 768, 315 S.E.2d 731 (1984), the North Carolina Court of Appeals upheld an award of treble damages under that state's UDAP where a landlord had rented an apartment that was uninhabitable in violation of an Order of a City's administrative agency prohibiting the landlord from renting the premises un-

til the needed repairs were made. 315 S.E. 2d at 731–732. In *49 Prospect Street Tenants Ass'n v. Sheva Gardens, Inc.,* 227 N.J.Super. 449, 547 A.2d 1134 (1988), the New Jersey Superior Court found that the New Jersey UDAP provided remedies to tenants despite the absence of a violation of any specific state regulations where tenants "were deprived of the bare essentials of habitability such as water, heat, and reasonable security." 547 A.2d at 1140–41.

Although the Pennsylvania Supreme Court, in *Monumental Properties,* was not addressing a breach of the implied warranty of habitability, the Court's reasoning is instructive here, and we think is a clear indicia that Pennsylvania would follow the foregoing decisions by courts of its sister states. The court there stated that UDAP was "designed to equalize the market position and strength of the consumer vis-a-vis the seller." 459 Pa. at 467, 329 A.2d at 820. The protection of UDAP was extended to landlord/tenant relationships in recognition of the fact that a tenant "is as much a consumer as is the purchaser of an automobile, household appliance, or any other consumer good." 459 Pa. at 468, 329 A.2d at 821. In addition, the Pennsylvania Supreme Court adopted, there, a broad construction of UDAP as covering "all unfair and deceptive acts or practices in the conduct of trade or commerce." 459 Pa. at 478, 329 A.2d at 826. It appears to us that the underlying proposes of UDAP are best served by the conclusion that it is a violation of UDAP where, as here, a landlord continuously and systematically breaches the warranty of habitability.

We are led to this conclusion not only because we think that such conduct falls within the residual "unfair method of competition" definition set forth in 73 P.S. § 201–2(4)(xvii), but because "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to, or after a contract for the purchase of goods or services is made," is specifically recited as an "unfair method of competition" in 73 P.S. § 201–2(4)(xiv). We do not believe that this subsection was meant to apply to only violations of written

*warranties.* Rather, it appears to apply to *any* "warranty" as well as to "any written *guarantee*."

■ Nevertheless, it is clear that not every breach of an implied warranty of habitability constitutes a *per se* unfair or deceptive act. *See Inniss v. Methot Buick–Opel*, 506 A.2d 212, 216 (Me.1986); and *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J.Super. 11, 501 A.2d 990 (App.Div.1985). Only under certain circumstances may the breach of an express or implied warranty constitute an unfair or deceptive practice proscribed by a state UDAP law. *Inniss, supra,* 506 A.2d at 216; and *D'Ercole,* 501 A.2d at 1101. *See also Burnham v. Mark IV Homes, Inc.,* 387 Mass. 575, 441 N.E.2d 1027, 1031 (1982) (breach of implied warranty of merchantability constitutes unfair or deceptive act or practice under state regulation); and *Mikos v. Chrysler Corp.,* 158 Mich.App. 781, 404 N.W.2d 783 (1987) (breach of implied warranty of merchantability constitutes unfair, unconscionable, or deceptive method, act or practice under the Michigan Consumer Protection Act).

We are also encouraged, in *Monumental Properties,* to look to cases interpreting the Federal Trade Commission Act, 15 U.S. C. § 45, *et seq.* (hereinafter "FTCA"), for guidance in interpreting Pennsylvania's UDAP. 459 Pa. at 463–66, 329 A.2d at 817–818. The United States Supreme Court, interpreting the FTCA, thusly set down standards for determining whether a particular act or practice is "unfair" in *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972):

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers.

■ We believe that the conduct of the Debtor here offends the public policy of this state that rental properties must be maintained in a reasonably fit condition throughout the period of any leasehold. *Pugh, supra,* 486 Pa. at 284, 405 A.2d at 903. The conditions of the Claimants' apartments fell well below standards established by the City of Philadelphia, as reflected by the forty-three violations noted there by L & I. We conclude that the Debtor's continuous failure to remedy serious defects in the Claimants' units, despite these violation notices and extensive proceedings before this court, reflect an unscrupulous disregard for his duties as a landlord. The substantial injury to the Claimants here has already been discussed *supra* and is amply supported by the evidence presented. As a result, we conclude that the Debtor's conduct here constituted an unfair practice proscribed by UDAP.

■ We hasten to caution that we are not holding that every breach of the implied warranty of habitability will call into play the extensive remedies of UDAP. We believe that only violations of an egregious or continuous nature should be considered to establish an unfair act or practice, giving rise to potential treble damages, under UDAP. *Compare Andrews, supra,* 78 B.R. at 84–85 (repeated nature of conduct justifies treble damages); and *Russell, supra,* 72 B.R. at 872 (fraudulent, inequitable conduct justifies treble damages).

■ Treble damages under UDAP are imposed only where a person suffers an "ascertainable loss of money or property." Damages are limited to the greater of the *actual* damages suffered or $100.00. We conclude from this language that damages under UDAP are limited to money or property actually lost. We also consider, here, the fact that the Claimants are asserting relatively large damages which they seek to treble. *Compare Andrews, supra,* 78 B.R. at 84–85 (damages of $68.25 trebled); and *Russell, supra,* 72 B.R. at 872 (damages of $300.00 trebled). It must be recalled, also, that the Debtor is in bankruptcy, and allowing the very large claims sought by the Claimants in full against him

will either reduce the share of the estate available for other creditors, *see* 91 B.R. at 341, or render it impossible for the Debtor to prepare a feasible Chapter 13 Plan and pay *any* creditors.

▮ Therefore, we will not allow the Claimants to treble their awards for "discomfort and humiliation." *Accord, Dorgan, supra,* 473 N.E.2d at 1153 (award for emotional distress not allowed as a "loss of money or property" under state UDAP). *But see Jungkurth, supra,* 74 B.R. at 335–36 ("actual damages" under 73 P.S. § 201–9.2, as to modest claims against non-debtor, need not be precisely measurable). We shall only treble those actual damages of the Claimants resulting in out-of-pocket expenses to them, excluding rent abatements. Nor will be treble the rent abatements awarded. We limit the Claimants' rent-abatement award in order to avoid providing a windfall to tenants who, having established breaches of the implied warranty of habitability, continue to remain in an unfit premises. We do not consider it a wise policy to, effectively, compel landlords to pay double the established rent back to tenants simply because they choose to continue to live indefinitely in an unfit premises. Tenants would thus be encouraged to not only remain in, but seek out and contribute to, rendering their premises unfit.

E. THE SPECIFIC AWARD TO THE TENANTS HERE: A RELATIVELY MODEST TOTAL SUM OF $9,350.06

Accordingly, we shall approve the Claimants' Proofs of Claim in the following amounts, in addition to their claims already allowed as administrative claims for post-petition damages, *see* 91 B.R. at 339 & nn 18–21, 343, and page 576 *supra:*

WILLIAMS:

| | |
|---|---|
| Allowable Consequential damages (heater, kerosene, food, and blankets) | $ 259.52 |
| Treble damages under UDAP | × 3 |
| | $ 778.56 |
| "Deprivation and humiliation" | 500.00 |
| Rent rebate | 1,575.00 |
| TOTAL | $2,853.56 |

ROBBINS:

| | |
|---|---|
| Allowable consequential damages | $ 285.50 |
| Treble damages under UDAP | × 3 |
| | $ 856.50 |
| "Deprivation and humiliation" | 500.00 |
| Rent rebate | 225.00 |
| TOTAL | $1,581.50 |

PALMERS:

| | |
|---|---|
| Allowable consequential damages | $ 395.00 |
| Treble damages under UDAP | × 3 |
| | $1,185.00 |
| "Deprivation and humiliation" | 500.00 |
| Rent rebate | 2,580.00 |
| TOTAL | $4,265.00 |

NELSON:

| | |
|---|---|
| Allowable consequential damages | $ 50.00 |
| Treble damages under UDAP | × 3 |
| | $ 150.00 |
| "Deprivation and humiliation" | 500.00 |
| Rent rebate | –0– |
| TOTAL | $ 650.00 |

The sum of these figures (9,350.06), while considerably less than that sought ($76,677.71), is quite considerable.

An Order allowing the instant claims in these amounts will be entered.

ORDER

AND NOW, this 21st day of February, 1989, after a hearing on December 8, 1988, on Objections of the Debtor to the proofs of claims of Beverly Williams (No. 16), Kathleen Robbins (No. 14), James and Marguerita Palmer (No. 18), and Carole Nelson (Nos. 11 and 20), considered, by agreement of counsel, on the record made in Adv. No. 88–0006S and the Briefs of the parties, it is hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED in part.

2. The proofs of claims in issue are allowed in the following amounts, as unsecured claims:

a. Beverly Williams—$2,853.56

b. Kathleen Robbins—$1,581.50

c. James and Marguerita Palmer—$4,265.00

d. Carole Nelson—$650.00

3. The hearing on Confirmation, the Objections thereto, and the Objection of the

Debtor to the Proof of Claim of Corestates Bank remains scheduled on

THURSDAY, MARCH 9, 1989, at 10:00 A.M. in courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

4. Any requests for continuances will not be favored. The Debtor should, accordingly, file any Amended Plans on or before February 27, 1989.